# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2002-DP-01855-SCT

*THONG LE*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/23/2002 |
| TRIAL JUDGE: | HON. JAMES W. BACKSTROM |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | DAPHNE L. PATTISON |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:  JUDY T. MARTIN |
| | MELANIE KATHRYN DOTSON |
| DISTRICT ATTORNEY: | KEITH MILLER |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 03/03/2005 |
| MOTION FOR REHEARING FILED: | 03/16/2005; DENIED & OPINION MODIFIED AT ¶ 143 - 04/28/2005 |
| MANDATE ISSUED: | |

**EN BANC.**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1.     On November 1, 2001, Ngan Tran ("Tran") and Thong Le ("Le") planned to rob the home of Minh Heiu Thi Huynh ("Minh"), where she lived with her two daughters, Thuy Hang Huynh Nguyen ("Thuy"), age fifteen, and Thanh Truc Huynh Nguyen ("Thanh"), age eleven.  Armed with a gun, the two men went to Minh's home, knocked on the door, and were allowed in by Thuy who was home with her sister.  Tran and Le tied and gagged the girls and waited for Minh

to return home. At some point, Tran briefly left the home to move the car, leaving Le with the girls.

¶2. When Minh returned home, she was overpowered and hogtied with electrical cord. When Tran demanded money, she directed him to her purse. The victims were beaten and strangled until they died. After attempting to sanitize the crime scene with bleach and water for several hours, Tran and Le left with approximately $1,300 and a bookbag containing some household items.

¶3. When Le was later arrested and charged with the crimes, he was carrying some of the money. He confessed to the robbery but maintained that he had no idea Tran planned to kill the mother and the girls. He insisted he took no part in the murders. Prior to Le's trial, Tran committed suicide. Le was convicted of three counts of capital murder and sentenced to death, and he now appeals, raising fifteen issues for our review.

## ANALYSIS

### 1. Did the trial court err in overruling defendant's motion for individual sequestered voir dire and the defendant's motion for additional peremptory challenges?

*Individual sequestered voir dire*

¶4. Le filed a motion for individual sequestered voir dire on the issue of the death penalty. At the hearing on Le's motion, his counsel claimed the pretrial publicity surrounding his case, coupled with additional publicity surrounding the his co-defendant's suicide, together with the attitudes of the death penalty in general, justified individual sequestered voir dire. The State disagreed, stating that individual voir dire should be allowed only in cases where the general questioning of the jury demonstrates the need for individual questioning.

2

¶5.    In denying Le's motion, the trial court stated:

> I believe we primarily would have individual voir dire from jurors who indicate that they have some knowledge of the facts of the case, and we wouldn't want them blurting out what they heard, or their opinions about this particular case, or whether the defendant should or shouldn't get the death penalty in this particular case. So we would certainly allow or consider allowing upon request, individual voir dire along those lines on that issue. Generally we don't allow individual voir dire as to the basic questions about the death penalty or their belief, but if somebody begins to enter into an area that might be prejudicial, then, of course, we can always stop them and do that on an individual basis. But I think we'll just wait on that until the time comes and see what responses we get.

¶6.    Le contends the denial of his motion was error, citing URCCC 3.05, which states that "individual jurors may be examined only when proper to inquire as to answers given or for other good cause allowed by the court."

¶7.    Prior to voir dire, the prospective jurors filled out a questionnaire. During voir dire, Le's counsel requested all prospective jurors to stand who responded in the questionnaire that they believed a person convicted of murder should automatically receive the death penalty. Twelve stood. Noticing that some prospective jurors remained seated who he believed should have stood up, Le's counsel requested the trial court to individually voir dire those prospective jurors who answered the question in the affirmative in the questionnaire, but did not stand in response to his request. The trial court denied this request and instructed counsel to ask his questions in public. Le's counsel then asked the venire if any would vote for the death penalty regardless of the circumstances if they found the defendant guilty of capital murder. Twenty-one prospective jurors responded that they would. Le contends that this was an unusually large number of prospective jurors predisposed to vote for the death penalty. He stated he could not freely explore the matter in open court for fear of tainting  the remaining prospective jurors.

3

Le contends that had the trial court allowed individual voir dire, defense counsel may have been able to demonstrate to the court to strike some prospective jurors for cause, leaving more peremptory strikes for the defense.

¶8. The record reflects, however, that Le requested only three of the prospective jurors in question be stricken for cause. In fact, the record reflects that the trial court struck (for cause) seven of the prospective jurors in question at the State's request. The record further reflects that all of the prospective jurors Le contends were "predisposed to the death penalty" were stricken as prospective jurors, either by the peremptory challenges or for cause.

¶9. Le cites *Jones v. State*, 461 So. 2d 686 (Miss. 1984), in support of his argument that the trial court erred by not allowing individual voir dire. However, in *Jones*, defense counsel *objected to* individual voir dire. This Court held that"it is well within the discretion of the trial judge to allow individual voir dire in a proper case." *Id.* at 692. Our refusal to reverse a trial judge for allowing individual voir dire is not authority for the proposition that we should reverse a trial judge for refusing to allow it.

¶10. Le contends that "[t]he safer practice in situations involving possible prejudice is to interrogate each juror separately and out of the presence of the other jurors," quoting from *United States v. Schrimsher*, 493 F.2d 848, 854 (5th Cir. 1974). In *Schrimsher*, the trial judge questioned the jury en masse regarding a newspaper article. Although the Fifth Circuit stated that individual interrogation of each juror would be a safer practice, it found that there was no error in the trial court's failure to do so. *Id.*

4

¶11. The State tells us Le fails to demonstrate any question Le was prevented from asking a single juror. Furthermore, at the conclusion of defense counsel's questions, the following took place:

THE COURT: Let me ask the attorneys to approach the bench briefly.

(BENCH DISCUSSION)

Are y'all satisfied with all the answers that were given on the death penalty?

MR. [DISTRICT ATTORNEY] MILLER: Sure.

THE COURT: Do you want me to ask anything else?

MR. MILLER: I'm fine.

THE COURT: Are you okay?

MR. [DEFENSE COUNSEL] CONANT: Yes, sir.

(END BENCH DISCUSSION)

¶12. The State contends that the individual voir dire issue on appeal is procedurally barred because Le's counsel declined the trial court's offer to ask any additional questions. Alternatively, the State cites *Edwards v. State*, 737 So. 2d 275 (Miss. 1999), for the proposition that the denial of individual sequestered voir dire does not constitute error. In *Edwards*, the defendant claimed the trial court erred by denying his request for individual sequestered voir dire under circumstances similar to those in the case sub judice. *Id.* at 307. Quoting Rule 3.05 of the Mississippi Uniform Circuit and County Court Rules, this Court stated "that the rule does not require more than what it states on its face," and trial judges act "within their discretion granted by the rule," when they deny motions for individual sequestered voir dire. *Id.* at 308 (citations omitted). This Court has also held:

5

> While the Court has stated that Rule [3.05] allows a circuit court, in its own discretion, to utilize individualized, sequestered voir dire, this Court further held that Rule [3.05] does not require more than what is stated on its face. *Russell v. State*, 607 So. 2d [1107], 1110. (internal citations omitted). In *Russell*, this Court stated that the "contention that he [Russell] should have been allowed to individually voir dire jurors out of the presence of the others is not supported by the decision of the Court.

*Russell*, 607 So. 2d at 1110; *White v. State*, 532 So. 2d at 1218.

¶13. The State reminds us that "[a]n appellant must show actual harm or prejudice before this Court will reverse a trial court's limitation on voir dire." *Morris v. State*, 843 So. 2d 676, 678 (Miss. 2003) (citing *Stevens*, 806 So. 2d at 1054). Furthermore, "this Court will treat with deference a venire person's assertions of impartiality." *Id.*

¶14. We reaffirm our holding in numerous cases, including *Stevens v. State*, 806 So. 2d 1031, 1054-55 (Miss. 2001), and again state that the decision of whether to allow individual sequestered jury voir dire should be left to the sound discretion of the trial court. The trial court in the case sub judice allowed juror questionnaires and open voir dire. He further offered the option of small group voir dire, and he allowed many prospective jurors to approach the bench to answer questions posed during voir dire. Finally, he offered Le's counsel the opportunity to have any additional questions put to the prospective jurors. We find no error here.

*Additional Peremptory Challenges*

¶15. Prior to trial, based on the heightened sensitivity of a death penalty case and issues related to the death penalty, Le's counsel requested additional peremptory challenges. Le contends that the denial of individual sequestered voir dire compelled him to use peremptory strikes on some prospective jurors who said they would automatically impose the death

6

penalty, and others who were not sure.  Stated another way, Le contends that – had the trial court allowed individual voir dire – he might have been able to convince the court to strike some of those jurors for cause, leaving him more peremptory strikes.

¶16.    Le claims he was forced to accept one prospective juror who was a victim of three robberies, another who was a brother-in-law of the Assistant Police Chief of Ocean Springs, two others who heard something about the case in the news media, and still another who received a strange phone call which left "T. Le" on the caller i.d.  Citing **Mhoon v. State**, 464 So. 2d 77 (Miss. 1985), Le says this Court has directed trial courts to consider affording defense counsel additional peremptory challenges in capital cases where the jury pool is improperly skewed in favor of death.  In **Mhoon**, 6 out of 12 jurors were either involved in law enforcement or were related by blood or marriage to law enforcement.  **Id.** at 80.  This Court held that "in the normal case - with a normal distribution of law enforcement officers and their relatives in the jury pool - there is no reason why, if left unchallenged peremptorily, an officer or an officer's relative should not serve on a jury if  otherwise qualified to follow the law and the evidence." **Id**. at 81 (citations omitted).  This Court went on to conclude:

> In this particular case, however, the sheer number of law enforcement-connected persons in the jury pool, as well as persons selected as jurors, has worked a great hardship on Mhoon.  Given the statistical aberation in the jury pool, the judge could have done several things to ameliorate its prejudicial effect: (1) he could have afforded counsel additional peremptory challenges, (2) he could have increased the size of the available venire as well as affording additional challenges, or (3) he could have sustained at least some of the challenges for cause.

**Id.**

7

¶17. Because Le's venire included only one potential juror who was related to a law enforcement officer, we do not find *Mhoon* helpful in resolving this case.

¶18. We are persuaded, however, by the fact that, in selecting the jury, Le did not exercise all of his peremptory challenges.[1] Having left peremptory challenges on the table, Le can hardly demonstrate prejudice for lack of additional peremptory challenges. We find this issue to be without merit.

### 2. Did the trial court err in failing to quash the jury, because it was not drawn from a fair cross-section of the community?

¶19. Le next contends that the jury panel did not represent a fair cross-section of the community because it did not include Asians. As to this issue, Le moved for additional peremptory challenges or, in the alternative, to quash the jury panel. The trial court denied the motion.

¶20. Circuit Clerk Joe Martin testified that the pool of potential jurors in Jackson County is taken from registered voters. Martin further testified that the special venire for Le's case was selected by computer, in accordance with the law, just like any other capital murder case. Le contends that the county does not take into account the fact that Asians do not vote, thus effectively eliminating a significant faction of the community from service on juries.

¶21. In an attempt to support this argument, Le cites *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed. 2d 690 (1975), which held that an accused is to be afforded a fair trial by

---

[1]During post-trial motions, the trial judge stated:
Okay. So I do not believe that there was any showing that additional peremptory challenges would be needed and, in fact, the Defendant didn't use all his challenges so I'll deny that request, that part of the motion.

an impartial jury chosen from a "fair cross-section of the community." However, in ***Taylor***, the United States Supreme Court held:

> It should also be emphasized that in holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition, ***Fay v. New York***, 332 U.S. 261, 284, 67 S.Ct. 1613, 1625, 91 L.Ed. 2043 (947); ***Apodaca v. Oregon***, 406 U.S., at 413, 92 S.Ct., at 1634 (plurality opinion); but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof.

***Id.*** at 702. Similarly, this Court has held:

> The Sixth Amendment to the Constitution of the United States mandates that all defendants receive a trial by an impartial jury. In ***Britt v. State***, 520 So.2d 1377 (Miss. 1988), Appellant claimed that he was denied a fair trial as there was not a cross-section of his community present in the seated jury. Appellant also alleged that the State systematically excluded men as jurors. This Court held that "[a]lthough the defendant does have a right to be tried by a jury whose members were selected pursuant to a nondiscriminatory criteria, . . . the Sixth Amendment . . . has never been held to require that petit juries actually chosen must mirror the community and reflect the various distinctive group of the population." ***Britt***, 520 So.2d at 1379 (citing ***Taylor v. Louisiana***, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975).

Furthermore, in ***Lanier v. State***, 533 So.2d 473 (Miss.1988), this Court outlined the elements necessary to establish a prima facie violation of the fair cross-section requirement for an impartial jury:

> 1) the group alleged to be excluded is a "distinctive" group in the community;
>
> 2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and
>
> 3) this under representation is due to systematic exclusion of the group in the jury selection process.

*Lanier*, 533 So.2d at 477 (quoting *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L. Ed.2d 579 (1979)).

*Simon v. State*, 688 So. 2d 791, 806 (Miss. 1997).

¶22. Given Martin's testimony that the potential jurors in Le's case were selected by computer, we fail to see how Asians are excluded from the jury pool, other than the fact that some Asians do not wish to vote and, therefore, willfully exclude themselves from the voter roll. We find this issue to be without merit.

### 3. Did the trial court err in overruling the defendant's *Batson* objection?

¶23. Le next contends that, for racially motivated reasons, the State struck all African Americans from the venire. Le properly raised a *Batson* objection to the strikes.

¶24. A prosecutor's racially motivated use of peremptory challenges is a clear violation of a criminal defendant's rights under the Eighth and Fourteenth Amendments to the United States Constitution. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Such discriminatory use of peremptory strikes requires reversal. *Conerly v. State*, 544 So. 2d 1370, 1373 (Miss. 1989).

¶25. A defendant who suspects the prosecutor has engaged in such conduct must make what has become known as a "*Batson* Challenge." The appropriate procedure to be followed for a "*Batson* Challenge" is set out by this Court in *Stewart v. State*, 662 So. 2d 552, 557-58 (Miss. 1995), as follows:

> 1. The party objecting to the peremptory challenge must first make a prima facie showing that race was the criteria for the exercise of the peremptory challenge.

10

2.	If this initial showing is successful, the party desiring to exercise the challenge has the burden to offer a race-neutral explanation for striking the potential juror.

3.	The trial court must then determine whether the objecting party has met their burden to prove there has been purposeful discrimination in the exercise of peremptory challenges.

*See also* **Stevens**, 806 So. 2d at 1046.

¶26.	Where a prosecutor's race-neutral reasons for a strike are accepted by the trial court, our standard of review of the trial court's decision is as follows:

> This Court accords great deference to the trial court in determining whether the offered explanation under the unique circumstances of the case is truly a race-neutral reason. **Stewart**, 662 So. 2d at 558. This Court will not reverse a trial judge's factual finding on this issue 'unless they appear clearly erroneous or against the overwhelming weight of the evidence.' **Id.** (quoting **Lockett v. State**, 517 So. 2d 1346, 1350 (Miss. 1987). One of the reasons for this is because the demeanor of the attorney using the strike is often the best evidence on the issue of race-neutrality. **Id.** at 559 (citing **Hernandez v. New York**, 500 U.S. 352, 365, 111 S. Ct. 1859, 114 L.Ed.2d 395 (1991)).

**Finley v. State**, 725 So. 2d 226, 240 (Miss. 1998).

¶27.	Le correctly cites **Chisolm v. State**, 529 So. 2d 635, 639 (Miss. 1988), for the proposition that a race-neutral reason offered can serve as a masks for a true discriminatory purpose. However, **Chisolm** further holds that "it is incumbent upon [the defendant] to come forward with proof when given the opportunity for rebuttal." **Id.**

¶28.	In the case sub judice, seven of the State's peremptory challenges were used to strike African-Americans. The State offered the following race-neutral reasons for the strikes:

*Juror Number 5*

¶29.	According to the prosecutor, juror number 5 asked very unusual and simplistic questions and appeared to lack understanding. The prosecutor cited **Perry v. State**, 637 So. 2d

11

871, 874 (Miss. 1994), in which this Court held that a lack of understanding is a race-neutral, non-prejudicial reason for a peremptory strike. Specifically, juror number 5 asked: "I have a solution [sic] about murder and capital murder. I don't understand the difference in those two." Later, during the defense's voir dire, he asked: "Sir, going back to your introduction, you said the word - what was that word you said, 'object'? What exactly is the meaning of 'object'?"

¶30. The State submits that it was reasonable for the prosecutor to conclude that either juror number 5 would have had considerable difficulty following and understanding the course of the trial, and/or he was trying to get dismissed from jury duty. The State further contends that the trial judge was attentive to this matter when the trial court stated that, based upon the court's observation of juror number 5 and his responses, he "was completely uninformed as to what he was here about." The trial court stated, "I got the impression that he was completely uninformed as to what he was here about, so I would say - - I'll deny that *Batson* challenge and say that that's a sufficient race neutral reason to strike the person." In *Perry*, this Court affirmed the juror's lack of understanding as a race-neutral reason for the strike, "a fact specifically found by the trial judge." *Perry*, 637 So. 2d at 874. We reaffirm that holding here.

*Juror Number 7*

¶31. According to the prosecutor, juror number 7 – an African-American schoolteacher – was struck because

> [s]he was a teacher and she said that she felt like it was more important for her – and quite frankly, I agree with her – she felt like it was more important for her to be teaching the first week of school than to be a juror here, and I felt like she wouldn't be concentrating on what she was doing, and would pretty much resent that fact that she was here.

12

¶32.    Defense counsel stated he believed those comments were accurate, and the trial court denied the **Batson** challenge believing that it was a sufficient race-neutral reason.   Le argues on appeal, however, that race neutral reasons must be related to the case, **Chisolm**, 529 So. 2d at 638, and that employment had nothing to do with the case.   During voir dire, the trial court questioned the potential jurors regarding hardships:

> JUROR NUMBER 7:   I am a teacher, also, and I would have to make arrangements.  I have 120 students that I have to see off during the day, and I would have to make arrangements for a sub folder, or notes or whatever to give to my students, and I also need medication.
>
> THE COURT: Well, do you think all of that could be accomplished and you could serve, or are you saying that you couldn't do that?
>
> JUROR NUMBER 7: I think I would be better serving my class if I was in class, since we're just starting school.

¶33.    The State further points out that it initially moved to strike juror 7 for cause.  In discussing juror number 7, the prosecutor stated:

> MR. MILLER (for the State):   She was a school teacher, I think.  She had a problem with sequestration, said she would best be serving her class in the classroom.   She knows one of the defense witnesses, not that that really means anything, but she did say that she had a serious problem with sequestration, does not want to serve, and feels like she could better serve her class.
>
> THE COURT: What do you say on that?
>
> MR. CONANT (for the defense): I don't believe that qualifies for cause, Your Honor.
>
> THE COURT: I don't either.  She did indicate she didn't want to serve, but she said she could get a substitute if necessary, I believe, so I'll deny that request for cause.

¶34.    Subsequently, the Circuit Clerk stated to the trial judge:

> MR. JOE MARTIN: No. 7 wanted to be [excused], also.

13

THE COURT: What?

MR. JOE MARTIN: The teacher.

THE COURT: What? About having to teach?

MR. JOE MARTIN: She didn't want to be here, Judge.

THE COURT: Well, I know that. A lot of them don't want to be here. I don't particularly want to be here myself.

MR. JOE MARTIN: I know. She said she had a problem with her school.

MR. SAUCIER: I think the main thing was the beginning of school. Not that they're in school, but it's the first week of school.

MR. MILLER: Are you talking about No. 7, Joe?

MR. JOE MARTIN: Yeah, She came to me, also.

¶35.    Furthermore, during voir dire, juror number 7 stated that she knew a witness for the defense: "I know Curtis Cotten pretty well. He's a friend of ours."

¶36.    The State exercised one of its peremptory challenges to strike juror number 7. When a defendant contends that the reasons for the strike offered by the State are pretextual, "[i]t is incumbent upon a defendant claiming that proffered reasons are pretextual to raise the argument before the trial court." *Mack v. State*, 650 So. 2d 1289, 1297 (Miss. 1994). Defense counsel failed to challenge the employment-related reasons for the strike as pretextual. The only response from defense counsel regarding the teacher's problems at school was that he believed those comments were accurate.

¶37.    Le points out that the State struck African-American jurors for the stated reasons, but did not strike white jurors who had much more compelling reasons to be struck. However, the issue before us is whether the race-neutral reasons offered were sufficient; not whether there

14

was another juror with more compelling reasons for a peremptory strike. Furthermore, defense counsel did not raise this issue to the trial court and is therefore procedurally barred from raising it here.

¶38.    Notwithstanding the procedural bar, the State contends that during the course of jury selection, the State expressed the following race-neutral reasons for striking juror number 7: 1) she had serious problem with sequestration; 2) she did not want to serve; 3) she felt she should be serving in the classroom; 4) she would not be concentrating on the trial; 5) she would resent the fact that she was on the jury and 6) she knew the defense witness. As authority for its position, the State cites *Manning v. State*, 735 So. 2d 323, 340 (Miss. 1999) ("A juror's reluctance to serve or preoccupation with matters outside the courtroom is a valid race-neutral reason for purposes of *Batson*"); *Brewer v. State*, 725 So. 2d 106, 122 (Miss. 1998) (The fact that the juror "had attempted to get off jury duty from the start" is a race-neutral reason.); *Woodward v. State*, 726 So. 2d 524, 531 (Miss. 1997) ("A prosecutor may sense by a juror's demeanor that he is hostile to being in court and this fear that the juror might respond negatively to the prosecution simply because the government was responsible for calling him to jury duty."); *Walker v. State*, 671 So. 2d 581, 628 (Miss. 1995) ("Jurors should not be forced to serve when they expressly state they do not want to.") and *Minor v. State*, 831 So. 2d 1116, 1122 (Miss. 2002) (The fact that a "prospective juror . . . knew a potential witness" is a race-neutral reason.).

¶39.    Defense counsel failed to raise the pretextual issue at trial, and the trial court accepted the State's reasons as race-neutral. Applying the appropriate standard of review, we are unable to find that the trial court's decision was clearly erroneous.

15

*Juror Number 18*

¶40.   The prosecutor stated he recognized juror number 18 right away as a juror who sat on a previous jury which returned a "not guilty" verdict in a criminal rape case.  Defense counsel responded by stating that the juror did respond that he had been on a criminal jury but he indicated that it would not affect his ability to sit on this one.  The trial court held: "I believe that would be a -- I'll deny the *Batson* challenge.  I think that would be a race neutral reason to strike him."

¶41.   The State cites *Brewer v. State*, 725 So. 2d 106, 123 (Miss. 1998); *Harper v. State*, 635 So. 2d 864, 868 (Miss. 1994); and *Ratliff v. State*, 740 So. 2d 359, 360 (Miss. Ct. App. 1999), as authority for the proposition that a potential juror's previously service on a jury that did not convict is a valid race-neutral reason.  Furthermore, the State cites *Walker v. State*, 815 So. 2d 1209, 1215 (Miss. 2002) and *Davis v. State*, 767 So. 2d 986, 995 (Miss. 2000), in support of its argument that a prosecutor's distrust of a juror is a race-neutral reason.

¶42.   We recognize that the potential juror assured the court that his previous jury service would not affect his ability to sit on this jury.  However, such assurances are more relevant to challenges for cause.  The State provided a race-neutral reason and we find the trial court did not err in denying defense counsel's *Batson* challenge for juror number 18.

*Juror Number 19*

¶43.   The race-neutral reason offered by the prosecution for juror number 19 was that the juror did not complete the last two pages of the potential juror questionnaire, which pages contained the questions the prosecutor considered the most critical.  Defense counsel stated that the omitted information could have been supplied during voir dire, and the juror made no

16

statements or comments which supplied a reason he could not sit on this jury. The prosecutor responded that he was unable to question the juror about this during voir dire because he was handed the questionnaire immediately before he began questioning, and did not get a chance to carefully review the responses until after voir dire questions were completed. The trial court stated,

> I would think that would be a race neutral reason, so I would deny the **Batson** challenge. And the party didn't complete the part of the death penalty, and I believe included in that are some of other things about trials or criminal matters, so I think that would be a race neutral reason.

¶44. The trial court specifically found that the juror did not complete the questionnaire and that it was the portion of the questionnaire regarding death penalty and trial and criminal matters. The State cites **Gary v. State**, 760 So. 2d 743, 749 (Miss. 2000), for its contention that the 'failure to complete the jury questionnaire" is a race-neutral reason. We agree and find that the trial court did not err in denying defense counsel's **Batson** challenge as to juror number 18.

*Juror Number 35, 36 and 37*

¶45. The prosecution stated juror number 35 was struck because she stated, both in the questionnaire and when questioned during voir dire, that she was against the death penalty. The following transpired regarding juror number 35:

THE COURT: What do you say on that?

MR. CONANT: I'm trying to see that she commented on that, Your Honor.

MR. SAUCIER (for the State): I'll show the Court the - -

17

THE COURT: She first said she would automatically - - This was somewhat confusing. I think at first she said she would automatically impose the death penalty, and then she said she didn't believe in the death penalty.

MR. SAUCIER: That's exactly what she said, and also, it follows correctly with her form, saying that she was generally opposed to the death penalty.

THE COURT: It says she would automatically impose the death penalty in one place, and generally oppose it.

MR. SAUCIER: It was very confusing. The whole time I was trying to figure out what she was saying.

MR. CONANT: I don't have anything to add.

THE COURT: I believe that would be a sufficient race neutral reason to strike the person. I'll deny the *Batson* challenge on her.

¶46. Defense counsel offered no rebuttal to the race-neutral reason given by the prosecution.

In *Gary v. State*, 760 So. 2d at 748, this Court held:

> the record clearly illustrates that [defense] counsel offered no rebuttal to the State's explanations for its peremptory strikes. In *Bush v. State*, 585 So. 2d 1262 (Miss. 1991), we stated that if a racially neutral explanation is offered the defendant can rebut the explanation. *Id.* at 1268. If the defendant makes no rebuttal, the trial judge must base his decision only on the explanations given by the State. *Id.*

We find the trial court did not err in denying this challenge.

¶47. The prosecution stated juror number 36 was struck because she stated in her questionnaire that she was strongly opposed to the death penalty and would always vote for life. Defense counsel responded that, when he specifically questioned her about her answer on the questionnaire, she stated it would not affect her decision in this case. The trial court stated, "Well, she said strongly opposed. In my heart of heart, I strongly believe not to take a life for a life, so I think that's a sufficient race neutral reason to strike her, and I'll deny the *Batson*

18

challenge on her." We agree and find the trial court did not err in accepting this race-neutral reason.

¶48. The prosecution stated juror number 37 was struck by the State because he stated that, because of the Ten Commandments, he was strongly opposed to the death penalty. Defense counsel did not challenge the State's reason for the strike. The trial judge stated that the juror "also said he would vote against the death penalty regardless of the circumstances. He would vote for the death penalty - - would not vote for the death penalty regardless of the circumstances."

¶49. Jurors number 35, 36 and 37 were all struck based on their views on the death penalty. In holding that a prospective juror's opinion on the death penalty is a race-neutral reason for a peremptory challenge, this Court has stated:

> We have held that a prospective juror's views on the death penalty do not make one a member of a distinctive class protected by **Batson v. Kentucky**, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed2d 69 (1986), and its progeny. [Citations omitted]. Therefore, the State was not prohibited from exercising peremptory challenges to strike jurors based on their beliefs concerning the death penalty.

*Jordan v. State*, 786 So. 2d 987, 1028-29 (Miss. 2001). *See also* **Berry v. State**, 802 So. 2d 1033, 1042 (Miss. 2001) ("A challenge by the State based upon a juror's views on the death penalty is an acceptable race neutral reason.").

¶50. Finally, the State points out that defense counsel failed to assert any pretext regarding its peremptory challenge of jurors 7, 18, 35, 36, and 37 and failed to refute the race-neutral reasons offered by the State as to juror number 5. Therefore, says the State, this issue is procedurally barred. We agree. However, even if the issue were not procedurally barred,

19

we are unable to find the trial court erred in accepting the race-neutral reasons offered by the State for the strikes of the seven African-American jurors. We therefore find no merit to this assignment of error.

### 4. Did the trial court err in overruling the defendant's motion to suppress his statement to law enforcement?

¶51. On November 3, 2001, Sergeant Joseph W. Nicholson ("Nicholson") arrested and interrogated Le. During the interrogation, Nicholson questioned Le as follows:

NICHOLSON: And the story that you are telling me is what you're going to have to live with the rest of your life? What's your religion?

LE: Buddhist.

NICHOLSON: You're a Buddist, ain't you? You believe in God, don't you?

LE: Yes sir.

NICHOLSON: And you believe in reincarnation, don't you?

LE: Yes, sir.

NICHOLSON: You believe in the souls of human individuals, don't you?

LE: Yes, sir.

NICHOLSON: And you believe that there is three souls that was taken tonight, don't you?

LE: Yes, sir.

NICHOLSON: And you believe that none of their souls are complete, none of their souls are complete cause you have one of their souls, don't you?

LE: No response.

NICHOLSON: Don't you.

LE: I do not sir.

20

NICHOLSON: You have one of their souls, you do and you know their life is not complete until you give them that soul back and you've got the burden to carry your soul and their soul and you can't carry that deep in you heart can you, Look at me, Look at me, Son, you can't carry that deep in your heart?

LE: (Inaudible)

NICHOLSON:  It's the difference between right and wrong, That's all it is.

LE: I know what's right and what's wrong.

NICHOLSON:  It's the difference between facing your fears.

LE:  I know what's right and what's wrong.

NICHOLSON:  You know what's right and what's wrong?

LE:  When we left out yesterday . . .

NICHOLSON: Tying up three women is wrong, son.  Tying up three women and killing them is wrong.

LE: I told you I didn't.

¶52.    During the interrogation, Le confessed to his involvement in the robbery and admitted that he "tied both sisters up" and that he "hit the back of the head" of the mother with his fist. Le later filed a pre-trial motion to suppress the confession, claiming that: (1) based on his age, his inexperience with the justice system, his limited skill with the English language and the manner in which the rights were read to him, under the totality of the circumstances, he did not knowingly and intentionally waive his constitutional rights, and (2) the police induced admissions by taking advantage of his religious beliefs when telling Le that the souls of the victims would never be free unless he confessed.  This, Le contends, made the statement involuntary.

21

¶53.   At the hearing on Le's motion to suppress, Nicholson, Mike Ezell[2] and Le testified.  In

denying Le's motion, the trial court stated:

> All right.   The Court would find that the evidence presented, shows beyond a
> reasonable doubt that the statement made by the defendant was freely and
> intelligently and voluntary made without any improper inducement.   There were
> no -- The Court does not find that there were any promises of salvation or
> redemption.   Basically the officer was getting to the point, or asking him about
> did he know - - did he understand right from wrong, and he indicated that he did.
> The evidence further shows that the defendant reads, speaks and understands
> English well.   He was born in the United States, although from a Vietnamese
> family.   He still went to English-speaking schools to the tenth grade, and in his
> testimony today spoke English fluently, and indicated that he understood English
> well and read English well, and as I said before, went to the tenth grade.   So there
> was no - - the Court finds there was no improper inducement made, and that his
> statement was a voluntary statement; that he understood his rights, and that he
> made a voluntary waiver of his constitutional rights; that the proper Marijuana
> (sic) [Miranda] Warnings were given to him.   He initialed each and every one of
> those and signed his name, which he signed the name that he uses, Tony.   So I'm
> going to deny the motion.

¶54.   During the trial when the State moved to introduce the statement, Le renewed his

objection, and the trial court overruled the objection.

¶55.   Where a trial judge finds at a preliminary hearing that a confession is admissible, "the

defendant/appellant has a heavy burden in attempting to reverse that decision on appeal."

***Evans v. State***, 725 So. 2d 613, 634 (Miss. 1997) (citations omitted).   "Determining whether

a confession is admissible is a finding of fact which is not disturbed 'unless the trial judge

applied an incorrect legal standard, committed manifest error, or the decision was contrary to

the overwhelming weight of the evidence.'"   ***Snow v. State***, 800 So. 2d 472, 495-96 (Miss.

---

[2]Mike Ezell is a law enforcement officer who was involved in the investigation of the crime and the interrogation of Le.

2001) (quoting *Lee v. State*, 631 So. 2d 824, 826 (Miss. 1994) (quoting *Balfour v. State*, 598 So. 2d 731, 742 (Miss. 1992)).

### A. Did Le Waive His Constitutional Right to Remain Silent?

¶56. Le contends that his age, inexperience with the justice system, and limited skill with the English language and culture, together with the manner in which his rights were read to him; and considering the totality of the circumstances test, prevented him from knowingly and intelligently waiving his constitutional right to remain silent. Le is correct in asserting that, "[w]hen determining voluntariness, the court must look at the 'totality of the circumstances' surrounding the statement." *Jones v. State*, 841 So. 2d 115, 130 (Miss. 2003). Le, who was nineteen years old at the time of the questioning, also points out that youth can be a factor to consider under the totality of the circumstances test. *Miller v. State*, 243 So. 2d 558, 559 (Miss. 1971).

¶57. In *Puckett v. State*, 737 So. 2d 322, 350 (Miss. 1999), this Court held:

> The purpose of *Miranda* is to protect the defendant's Fifth Amendment right against self-incrimination by affording him the right to remain silent. However, if the defendant does not take advantage of his right to remain silent, any statements he voluntarily makes can and will be used against him in a court of law. . . . Accordingly, when a defendant does not heed these warnings and invoke his right to silence, but voluntarily makes statements, it is not error for the prosecution to use these statements at trial against the defendant.

¶58. Le was given his *Miranda* warnings on two separate occasions.[3] At the hearing on the pre-trial motion, Le testified on direct examination that he thought that the police had told him "something about getting a lawyer," but that Le did not understand that it was his constitutional

---

[3]Nicholson testified that Le was read his *Miranda* rights when he was physically arrested and again when he signed the Rights form.

23

right at the time. Le further testified that he had signed a release of his rights form, but that he had signed it without looking at the statement. However, Le also stated that "if [he] did sign it, [he] probably glanced through it." Le testified that he could read English. Le further testified that he signed the release while being questioned by the police, who told Le to initial the form. Le stated that he did so, but "didn't look" at it. On cross-examination, Le testified that he had heard the *Miranda* warnings many times on television, but stated that if he had understood his constitutional right to remain silent, he would not have answered the police officer's questions. The State questioned Le about what it was he did not understand about his rights, and Le answered that he "just felt like . . . [he] had to answer [the officer's] questions." Le admitted that his *Miranda* rights had been given to him twice, and that he had signed the release form.

¶59. Le contends that he did not understand his rights because of the cultural barriers and because, "in the shrimping community on the Gulf Coast, the Vietnamese can live their lives separate from the American community, separate in speech, separate in religion, and separate in culture." However, after observing Le and hearing his testimony, the trial judge concluded that Le knowingly, intelligently and voluntarily waived his right to remain silent. We find that the trial court did not apply an incorrect legal standard, did not commit manifest error, and his decision was not contrary to the overwhelming weight of the evidence. *Snow*, 800 So. 2d at 495-96. Thus, this issue has no merit.

### B. Religious Comments

¶60. Le contends that Nicholson improperly used his religious beliefs to coerce him into making incriminating admissions. Citing *Johnson v. State*, 107 Miss. 196, 209, 65 So. 218,

24

219 (1914), Le tells us such use of religion and spirituality in the interrogation room is condemned by this Court. It is true that a confession was obtained from Johnson, at least partially by offering him the hope of salvation, and that this Court found the confession to be involuntary. However, there were significant factual differences in *Johnson* which make impossible any meaningful comparison to the case before us today. In *Johnson*, this Court described it as follows:

> Appellant was friendless, and a stranger in the city. He was charged with the gravest offense known to the law and imprisoned therefor. He was ill and in a nervous and weak physical condition. He was under fear of mob violence. In this condition, he was visited three times within 24hours by a strong man, one who was experienced in obtaining confessions, and who visited him only to secure his confession. The very words used in the effort to obtain the confession were enough, under the circumstances, to put appellant, already sick and excited, in nervous dread.

*Johnson v. State*, 65 So. at 219-20. In analyzing whether Johnson's confession was coerced, this Court stated:

> It is necessary to look at all the surrounding [circumstances] of the person making the confession in order to determine whether it is rendered inadmissible because it resulted from fear or threat or the undue influence of a person, even though one not in authority, operating upon the mind of the person confessing. Even the acts of third persons may amount to a threat excluding confession, though no objectionable words are spoken.

*Id*. at 219.

¶61. In the case sub judice, Le had already confessed to the robbery and to the fact that the killings occurred during the course of the robbery, before any mention of his religion. Furthermore, we do not find in the record any admissions in response to the religious line of questioning. To the contrary, Le continued to deny killing anyone.

25

¶62. Le argues that the religious comments led him to admit important details which could matter a great deal to a jury deciding whether to impose a sentenced to death. Even if true, however, Le must further demonstrate that the religious discussion constituted impermissible coercion.

¶63. In *Welch v. Butler*, 835 F.2d 92 (5th Cir. 1988), Welch made a statement, in a taped conversation with his wife, that he was concerned that God would never forgive him for committing murder. *Id.* at 93. During later questioning at the police station, Welch and a police officer "discussed forgiveness and salvation and prayed together for about three hours. During this time, Welch made incriminating statements." *Id.* at 93. At trial, Welch objected to the admission into evidence of these statements, claiming they were coerced. *Id.* at 95. In reviewing the issue, the Fifth Circuit stated:

> To hold that the inculpatory statements were made voluntarily, "we must conclude that he made an independent and informed choice of his own free will, possessing the capability to do so, his will not being overborne by the pressures and circumstances swirling around him. The burden of proving facts which would lead to an opposite conclusion is on the [defendant]" *Jurek v. Estelle*, 623 F.2d 929, 937 (5th Cir. 1980) (en banc).

> There can be no doubt that Welch's confession was not the product of will overborne by the police. One does not have to be devout to accept the fact that Welch was concerned about his salvation and about divine forgiveness. However, this concern existed before his conversations with Easley. At most, the police set up a situation that allowed Welch to focus for some time on those concerns with a fellow Christian in the hope that his desire to be saved would lead him to confess. What coercion that existed was sacred, not profane.

835 F. 2d at 93.

¶64. In carefully reviewing the record, we cannot find any error in the trial court's decision to allow into evidence the statements made by Le.

26

**5., and 6. Did the trial court err in overruling the defendant's objection to the admissibility of opinion testimony by Grant Granham and defendant's motion for mistrial regarding forensic test results?**

¶65. Le claims that Grant Graham was not qualified to give expert testimony and, even if he was, his testimony should have been excluded because of a discovery violation.

¶66. On July 19, 2000, the trial court entered an order requiring the State to produce to the defense all expert opinions. The witness list provided to Le's counsel stated in pertinent part:

> Enclosed is an updated witness list of may call witnesses:
>
> 1) Grant Graham - Gulf Coast Mississippi Crime Lab was a crime scene technician; will explain the three enclosed diagrams; will identify crime scene photos.

¶67. Rule 9.04 of the Uniform Circuit and County Court Rules states in pertinent part:

> [T]he prosecution must disclose to each defendant or the defendant's attorney, and permit the defendant or defendant's attorney to inspect, copy, test, and photograph upon written request and without the necessity of court order the following which is in the possession, custody, or control of the State, the existence of which is known or by the exercise of due diligence may become known to the prosecution:
>
> Any reports, statements, or opinions of experts, written, recorded or otherwise preserved, made in connection with the particular case and the substance of any oral statement made by any such expert.

¶68. Graham testified at trial that based on blood stain patterns and other evidence, the victims had suffered blunt force trauma. He based his opinion, at least in part, on blood stain patterns. This led to a motion for mistrial which was denied. Graham also offered testimony about two vehicles obtained by the Sheriff's office. Information about the blood stain patterns and the two vehicles was included in a report authored by Graham and provided to the Sheriff, but not provided to Le's counsel.

¶69.   According to Graham, one of the vehicles contained a white, plastic gallon jug which contained an unknown clear liquid.   Graham then offered an opinion as to how one could remove fingerprints from a crime scene.   Le's counsel objected, claiming the liquid was not identified, and further claiming he was not told in discovery of the two vehicles.

¶70.   In response to Le's objections regarding alleged discovery violations, the prosecutor stated to the court:

> Judge, he got everything that's in discovery.   There's a list of where the items were found, the search warrant, consent to search, everything.   He needs to look at his discovery.

¶71.   Graham then gratuitously informed the court: "I did include the information in my report, as well."   The trial judge then overruled the objection, and questioning resumed until the court released the jury for lunch at 12:00 p.m.   When everyone returned from lunch at 1:30 p.m., and with the jury in the jury room, Le's counsel revisited the issue of Graham's report. He told the court:

> Well, I don't have a report from Mr. Graham at all.   He mentioned on the stand that he had provided a report to the District Attorney's office.   Unless his report was his diagrams only, I haven't received anything like that.

¶72.   Without ruling on the objection, the trial judge allowed Le's counsel to cross examine Graham, who testified he sent his report to the Sheriff's department on March 5, 2002.   After allowing the prosecutor to complete redirect examination, the court sent the jury back to the jury room[4] to allow counsel to discuss Graham's report.   During the discussion, Le's counsel

---

[4]After returning from lunch at 1:30 p.m., the jury listened to thirteen minutes of testimony, and was then returned to the jury room at 1:43 p.m., where they remained for almost an hour.

28

requested a mistrial, based upon the State's "violation of discovery." The court allowed Le's counsel thirty minutes to review the report, after which he renewed the motion for a mistrial.

¶73. In denying the motion for mistrial, the court stated that Le had not shown prejudice. However, the trial court allowed Le's counsel to cross-examine Graham outside the presence of the jury to explore the issue.

¶74. Le now raises the issue with this Court, claiming that both the expert testimony and the discovery violation require reversal of his conviction. As support for his position, Le cites *Ramos v. State*, 710 So. 2d 380, 386 (Miss. 1998), which states:

> In *Hertz v. State*, 489 So. 2d 1386 (Miss. 1986), we admonished the prosecuting attorneys that they 'should make available to attorneys for defendants all . . . material[s] . . . and let the defense attorneys determine whether or not the material is useful in the defense of the case. We direct the attention of trial judges to this problem and suggest that they diligently implement this suggestion in order to dispense with costly errors which might cause reversal of the case, *Barnes v. State*, 460 So. 2d 126 (Miss. 1984); *Harris v. State*, 446 So. 2d 585 (Miss. 1984); *Morris v. State*, 436 So. 2d 1381 (Miss. 1983).' *Id.* at 1388 (emphasis added). In *Dotson v. State*, 593 So. 2d 7 (Miss. 1991), this Court reproved, 'Now, we take this opportunity to reinforce that which we stated in *Hertz* with a simple message to the bench and bar. *Read Hertz*! *Apply Hertz*!' *Id.* at 12 (Emphasis added).

*Ramos*, 710 So. 2d at 385-86.

¶75. Le also cites *Acevedo v. State*, 467 So. 2d 220, 224 (Miss. 1985), in support of his contention that cross-examination of an expert is insufficient to correct the error, since his counsel had no notice or reasonable opportunity to prepare for an effective cross-examination. Furthermore, citing *Harrison v. State*, 635 So. 2d 894 (Miss. 1994), Le contends that the trial court's failure to grant a continuance was reversible error. In *Harrison*, it was found that the

trial court did not comply with the requirements of **Box.**[5] **Id.** at 900. The defendant had filed a motion pursuant to Rule 4.06, as well as a motion to compel the State to come forward with the evidence. **Id.** at 898. "The State responded only by providing a copy of Dr. McGarry's autopsy report, which did not state any opinion as to the instruments that caused the victim's injuries." **Id**. During trial, Dr. McGarry testified as to his opinions on possible causes of certain injuries, the victim was conscious when certain injuries were inflicted and the victim was raped. **Id.** The defense counsel made a discovery violation objection which was overruled. Additionally, the trial court refused denied counsel's attempt to invoke the requirements of **Box**. **Id.** at 899. As a result, this Court found reversible error. **Id.** at 900.

¶76. Le contends that had Graham's opinions been produced prior to trial, his counsel could have evaluated the opinions with the assistance of a forensic expert. Rule 9.04 (I) of the Uniform Circuit and County Court Rules provides in pertinent part:

> If during the course of trial, the prosecution attempts to introduce evidence which has not been timely disclosed to the defense as required by these rules, and the defense objects to the introduction for that reason, the court shall act as follows:
>
> 1. Grant the defense a reasonable opportunity to interview the newly discovered witness, to examine the newly produced documents, photographs or other evidence; and
>
> 2. If, after such opportunity, the defense claims unfair surprise or undue prejudice and seeks a continuance or mistrial, the court shall, in the interest of justice and absent unusual circumstances, exclude the evidence or grant a continuance for a period of time reasonably necessary for the defense to meet the non-disclosed evidence or grant a mistrial.

---

[5]**Box v. State**, 437 So. 2d 19 (Miss. 1983), which set forth suggested guidelines when trial courts are faced with a Rule 9.06 discovery violation. These guidelines are now found in Rule 9.06 (I).

3. The court shall not be required to grant either a continuance or mistrial for such a discovery violation if the prosecution withdraws its efforts to introduce such evidence.

¶77. Furthermore, as discussed *supra*, the rules require the State to produce to the defense any opinions and reports rendered by experts. "To give expert testimony, the witness must be qualified and tendered as an expert. If the expert witness has not been first tendered as an expert, the expert opinion should not be allowed." **Walker v. State**, 740 So. 2d 873, 882 (Miss. 1999). However, in the case sub judice, Graham was not tendered as an expert witness. Nevertheless, he was allowed to provide an opinion that the injuries to the victims were the result of blunt force trauma. Specifically, he testified that at the crime scene, he observed that in the room where Thuy's body was found, the bed skirt showed blood-stain patterns which were consistent with blunt-force trauma. Graham further testified that he found a fire extinguisher at the crime scene.

¶78. Giving Le the benefit of every doubt, the most that can be said of Graham's "expert" testimony is that he provided cumulative evidence that the victims suffered blunt force trauma, a conclusion which hardly required expert evaluation. The photographs introduced into evidence require little imagination regarding whether the victims suffered blunt force injuries. Their heads were bashed in. Even if expert testimony was necessary to establish the fact, the State called another witness, Dr. McGarry, who testified that one of the victims had a massive head injury to the back of her head. Dr. McGarry explained that the victim's scalp had been broken open, her head was caved in and her skull was driven into her brain, and that she had bruises around her face and a fractured jaw. Dr. McGarry testified that these injuries were the result of the beating or pounding of her head with some kind of heavy object.

¶79. Furthermore, since Le admitted that all three victims were beaten, including blows to the head with a fire extinguisher, he can hardly claim prejudice from surprise testimony, expert or not, which established nothing more than an opinion of blunt force injuries to the victims.

¶80. In *Walker v. State*, 740 So. 2d 873, facing a similar issue raised on appeal, this Court held the testimony of a sheriff to be expert testimony because it was based on bloodstains and the position of the victim's body. However, "[t]he error was, in the end, harmless because there was other testimony to the same effect." *Id.* at 882. The cumulative evidence in *Walker* pales in comparison to the cumulative evidence here. We find Le's assignment of error regarding Graham's expert opinion of blunt force trauma is without merit.

¶81. We turn now to Le's objection to Graham's report based on an alleged violation of discovery rules. To begin, we shall review part of Graham's testimony, a portion of which has already been discussed *supra*. Graham testified that he had examined two vehicles, and had found in one of them a plastic gallon jug containing clear liquid. Defense counsel objected, alleging that the defense had not received any information in discovery about the examination of the vehicles. The trial court overruled the objection, and defense counsel requested time to review Graham's report. After Le's counsel's was allowed a thirty minute review of the report (discussed *supra*), the defense moved for a mistrial. Defense counsel claimed that Graham's report revealed that at the time Graham observed the crime scene, three cars were in the victims' driveway, and that had defense counsel known this, he would have questioned an earlier witness about the cars. The prosecution responded that the cars were visible in the photographs of the crime scene, and that Le mentioned one of these cars in his statement.

32

¶82.    The trial court then properly focused on whether the defendant suffered any prejudice as a result of the alleged discovery violation.    The trial court stated that defense counsel had not shown any prejudice.    The trial court also stated that the defense would be given an opportunity to question Graham about the report outside the presence of the jury,   and that the defense would be allowed to recall for further examination the earlier witness who counsel claimed he would have questioned about the cars.

¶83.    The purpose of Rule 9.04 is to avoid ambush or unfair surprise to either party at trial. *Hunt v. State*, 687 So. 2d 1154, 1164 (Miss. 1996).    Furthermore, Mississippi Rule of Evidence 103(a) provides that "[error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected."

¶84.    We agree with the trial court.    Le did not demonstrate that previously undisclosed evidence introduced at trial affected his substantial rights.    Neither the jury nor Le learned anything material from Graham or his report.    Therefore, Le suffered no prejudice, and this assignment of error is without merit.

*Five-gallon bucket of liquid*

¶85.    Graham also testified about a five-gallon bucket of liquid found at the crime scene.    He stated that it could have been used to attempt to destroy fingerprints, or other evidence.    As in the case of blunt force trauma discussed *supra*, Graham's testimony regarding the bucket of liquid which might have been used to clean up or destroy evidence, was cumulative of other evidence.    According to Le's own testimony, he admitted to the police that the bucket, water and bleach were used to sanitize the crime scene.    Thus, Graham's testimony regarding the

bucket of liquid was cumulative. Additionally, the issue is procedurally barred because Le offered no contemporaneous objection regarding Graham's alleged expert testimony about the bucket and liquid.

¶86. We find the trial court summed up the issue nicely during the hearing on post trial motions:

> It seems to me that there wasn't any opinion evidence, expert evidence presented through this witness that impacted in any way the defense of this, of the Defendant in this case. What any opinions he gave would appear to me to be not expert opinions, but opinions that any person could give. And if it was anything that he gave an opinion about, it was cumulative of other evidence that was introduced. So I don't see that there was any prejudice to the Defendant in this case.

We agree.

### 7. Did the court err in overruling defendant's motion for mistrial when the defendant was made aware that evidence was known to the State to rebut a showing on the part of the defendant that he exhibited a character for peacefulness?

¶87. During the guilt phase of the trial, one of the prosecutors informed Le's counsel that the State had recently received unverified information "about Mr. Le having gang involvement and activity with drugs." If the information could be verified, the State intended to use it to rebut any evidence Le might present as to his character for peacefulness. The prosecutor informed the court that an investigator was contacting an inmate at the Harrison County jail to get verification. Le's counsel stated that he was unaware of any such information, and would need to be informed before starting Le's case-in-chief. The court agreed to take the matter up when the State rested in the guilt phase of the trial.

¶88. When the State rested, the court instructed the prosecutor to attempt to get the requested information regarding Le's possible gang and drug involvement. Following the recess, the prosecutor admitted that he did not have credible evidence of the gang activity. As to drug activity, the trial court held: "I don't believe that selling drugs, while it is certainly a serious crime and is a crime, I don't think that goes - - would go to the issue of peace or violence."

¶89. Le now raises the issue, claiming he was entitled to a mistrial because the prosecutor did not produce the information. However, the record reflects that Le never requested a mistrial on this point. Therefore, this issue is procedurally barred. Furthermore, Le has not shown any violation of the rules or misconduct regarding this issue. It therefore has no merit.

**8. Did the Court err in reversing its previous Order and in subsequently holding that information concerning the defendant's alleged, unrelated past involvement with inmate Bob Cunningham in trading guns for drugs could be used for impeachment as to the defendant's character for peacefulness?**

¶90. During the guilt phase of the trial, the prosecutor informed Le's counsel and the trial court that the State had obtained new information from a federal inmate named Bob Cunningham, who had made a statement to the FBI regarding drug dealings and the sales of guns to Le for a gang war. The State intended to offer Cunningham as a rebuttal witness to any evidence presented by Le of his character for peacefulness. After hearing the proffered testimony outside the presence of the jury, the court ruled that the testimony was not admissible during the guilt phase but that it may be admissible during the sentencing phase.

¶91. Cunningham was never called as a witness in the trial. Nevertheless, citing *Hicks on v. State*, 697 So. 2d 391 (Miss. 1997), Le claims the trial court committed reversible error by not conducting a balancing test on Cunningham's proposed testimony. According to *Hicks on*, "the trial court must make an on the record determination that the probative value of admitting the evidence outweighs it prejudicial effect on the party." Le argues that, even though Cunningham was not called, the threat that he might be called was prejudicial. Le claims he changed his plans to testify as to his character during the guilt phase, and call his mother to testify as to his character for peacefulness during the sentencing phase.

¶92. As stated, the trial court had ruled the testimony inadmissible in the guilt phase. Thus, the threat of Cunningham's testimony did not prevent Le from testifying during the guilt phase. Furthermore, the trial court did not rule the testimony admissible during the sentencing phase, but rather deferred his ruling. Le claims he was entitled to an immediate ruling, and that the trial court should not have deferred the decision. This, Le claims, left him in "limbo," chilling his right to testify and to present evidence on his behalf. The record reflects, however, that before the jury was brought in for the sentencing phase, the trial court questioned the State and the defense about any matters that needed to be taken up outside the jury's presence. The State informed the court that Cunningham was a possible witness for rebuttal purposes only. The trial court then stated that it would explain to the jury that this was the sentencing phase of the trial, and that the State would have an opportunity to make an opening statement, and then they would proceed with any other evidence.

¶93.    When the court asked Le's counsel if he was ready to proceed, he did not object to, nor request a ruling on the admissibility of, Cunningham's proposed testimony.    Instead, he informed the court that he was ready to go forward.    Cunningham did not testify.    Le did not proffer any proposed testimony from himself or his mother.    In ***Rushing v. State***, 711 So. 2d 450 (Miss. 1998), this Court stated:

> We 'cannot decide an issue based on assertions in the briefs alone; rather, issues must be proven by the record.' ***Medina [v. State]***, 688 So. 2d [727], 732 [(Miss. 1996)]. In ***Welcher v. State***, 697 So. 2d 1087, 1095 (Miss. 1997), where the defendant claimed that he was denied the opportunity to testify because the judge declined to make a blanket ruling on his motion in liming regarding the admissibility of prior bad acts, we further found that the assignment of error was procedurally barred because of Welcher's failure to make a proffer of the testimony he would have presented.
>
> ***
>
> While . . . the content of the defendant's testimony may be of little assistance to the trial court in making a decision on admissibility, the requirement of a proffer serves two purposes.   It provides a modicum of assurance that the requested ruling is not purely advisory and, most importantly, it provides a basis for this court's harmless error analysis. [***Welcher,*** 697 So. 2d at 1095].
>
> ***
>
> As we further stated in ***Heidelberg v. State***, 584 So. 2d 393, 395 (Miss. 1991), a defendant must preserve for the record 'substantial and detailed evidence' of what he would have testified since . . . 'if a defendant in fact has nothing of substance to say in his own defense, we are hardly likely to give the time of day to his suggestion that his right of allocation was chilled by the foreknowledge that the prosecution would present his prior conviction.'

***Rushing***, 711 So. 2d at 456.

¶94.     We therefore hold this issue is procedurally barred.     Furthermore, "[procedural bar notwithstanding, we cannot hold the circuit court in error for failing to rule on the admissibility of any prior bad acts or previous convictions until the State seeks to introduce such evidence." *Id.*    (citing *Welcher*, 697 So. 2d at 1095).    For the reasons stated, this issue is without merit.

> **9.     Did the Court err in overruling defendant's motion to preclude admission of the statement made by the deceased co-defendant, Nan Than?**

¶95.     Before Than committed suicide, he made certain statements to law enforcement which the State intended to use against Le.  Le objected, claiming use of the statement would violate his constitutional right to confront the deceased witness.    However, the trial court was informed that Le, himself, intended to introduce certain statements allegedly made by Than to inmates.  After hearing argument and considering the matter, the trial court stated:

> [If you offer the testimony of someone under the hearsay exception, that this witness is now deceased and of course unavailable to testify.  If you offer testimony of his statement as to what he may have said to these inmates, then I believe the defense - - I mean, I believe the State, in rebuttal to that -- defense of that, could offer the statement that the co-defendant made to law enforcement.  Now, I haven't looked at that statement.  It may be that some of it would have to be redacted.  I don't know that it would or not, and I don't know exactly how that could be done, but I believe they would be entitled to put forth any evidence that would impeach what was said to these other witnesses.

¶96.     After Le offered into evidence alleged statements of Than to other inmates, the State moved to introduce, in rebuttal, a tape recording and transcript of Than's statement to law enforcement.  After reviewing the transcript, the trial court ruled the statement was admissible,

38

and that the court would provide a limiting instruction[6] to the jury, advising that the statement was being admitted for the limited purpose of weighing the credibility of Than's statements to the inmates.

¶97.    Le now tells us that the trial court violated his constitutional right to confront Than, and further that the statement was hearsay which did not fall within any hearsay exception.  Le cites *Lee v. Illinois*, 476 U.S. 530, 541, 106 S.C. 2056, 90 LED.2d 514, 526 (1986), and *Williamson v. United States*, 512 U.S. 594, 114 S.C. 2431, 129 LED.2d 476 (1994), in support of his position.  However, the statements in issue in those cases were not offered in rebuttal, which distinguishes them from the case sub judice.  We find better counsel from *Jordan v. State*, 728 So. 2d 1088 (Miss. 1998), in which this Court considered and rejected the same argument presented by Le.  In *Jordan*, the defense called a goalmouth, Charlie McCree, who testified about an alleged statement made by Fontrell Edwards, who was unavailable at trial.  In rebuttal, the State called the Sheriff to testify as to a statement Edwards made to law enforcement shortly after his arrest.  Finding no error in the decision of the trial court in *Jordan* to admit the statement, this Court held:

---

[6]The limiting instruction was as follows:

Let me give this instruction to the jury on this tape.  This is the tape taken by the officers from Mr. Than who was the co-defendant in the case.  And it is admitted for the limited purpose on the issue of the credibility of Mr. Than in regard to his other statements that have been testified about.  It should not be considered by you as evidence on the issue of the guilty or innocence of the defendant.  It just goes to the issue of the credibility of the previous comments that were made by Than.

39

Jordan asserts the testimony of Sheriff Cross consisted of inadmissable hearsay which should have been excluded by the trial judge. He further claims the admission of Cross's testimony violated his right to confrontation under both the United States and Mississippi Constitutions. We disagree. The testimony of Sheriff Cross was properly admitted to impeach the credibility of Frontrell Edwards pursuant to Miss. R. Evid. 806, which provides in pertinent part:

> When a hearsay statement, or a statement defined in rule 801(d)(2), ©, (D), or (E), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if the declarant had testified as a witness.

If the declarant, Frontrell Edwards, had testified as a witness for the defense, the State would then be permitted to cross examine Edwards or call another witness to the stand to attack Edwards' credibility . However, since Edwards was unavailable as a witness, the defense was allowed to introduce hearsay statements into evidence through the testimony of Charlie McCree. Miss. R. Evid. 804(b)(3). In accordance with Rule 806, the trial judge then allowed the State to call Sheriff Cross in order to attack the credibility of the declarant as if the declarant had testified as to the prior statements. We find no error by the lower court in this respect.

Jordan asserts the admission of Edwards' statements by way of Sheriff Cross violates his constitutional right to confront the witness against him. The Confrontation Clause of the Sixth Amendment of the United States Constitution provides, "In all criminal prosecutions, the accused shall enjoy the right . . .to be confronted with the witnesses against him." Article 3, Section 26 of the Mississippi Constitution contains an almost identical provision. In *Lanier v. State*, 533 So.2d 473 (Miss.1988) we relied on the United States Supreme Court's interpretation of the confrontation clause, stating the purpose of the confrontation clause is fulfillment of the " 'mission . . . to advance the accuracy of the truth determining process . . .by assuring that the trier of fact has a satisfactory basis for evaluating the trust of a prior statement.' " *Lanier,* 533 So.2d at 488 (quoting LaFave and Israel Criminal procedure § 23.3(d) at 877-78 (1985) (quoting *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970)). Counsel for the defendant was aware that Frontrell Edwards was unavailable as a witness, but nevertheless placed Charlie McCree on the witness stand to introduce statements made by Edwards which favored the defendant. It is rationally inconsistent and constitutionally wanting for defense counsel to

40

now argue that the subsequent introduction of Edwards' statements which disfavored the defendant was in violation of the defendant's right to confront Edwards through the defense opened the door with Charlie McCree's testimony. We find no error due to lack of cross-examination under the facts presented.

*Jordan*, 728 So. 2d at 1096-97.

¶98.   We recognize that *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), prohibits the introduction of testimonial out-of-court statements under the Confrontation Clause, unless the defendant had prior opportunity for cross-examination. However, *Crawford* is distinguishable from the case sub judice for two reasons.  First, unlike the statement in *Crawford*, Tran's statement was offered by the State only in rebuttal.  In his case-in-chief, Le called witnesses to testify about Tran's statements.  In doing so, Le opened the door for the State to call a rebuttal witness to contradict the defense witnesses' testimony about Tran's statements.  Secondly, in the case sub judice, the trial court gave a limiting instruction to the jury which explained that Tran's statement to law enforcement was not to be considered in determining Le's guilt or innocence, but was only to be considered for limited purposes of determining the credibility of Tran's statements.

¶99.   Le further contends that, even if such statements are allowed for impeachment purposes, the prosecutor used the statement under guise of impeachment.

¶100.  It is true that this Court has held "a prosecutor may not use prior statements of a witness 'under guise of impeachment for the *primary* purpose of placing before the jury substantive evidence which is not otherwise admissible.'" *Harrison v. State*, 534 So. 2d 175, 178 (Miss. 1998) (citing *United States v. Livingston*, 816 F.2d 184, 192 (5th Cir. 1987)).  However, we

41

find no merit to this argument. Le presents nothing which indicates the prosecutor's purpose was different from that stated to the court. Had Le not placed into evidence the statements of the inmates, the State would not have been allowed to use Tran's statement to law enforcement.

¶101. For the reasons stated, we find no merit to this assignment of error.

**10. Is the sentence of death excessive or disproportionate to the penalty imposed in similar cases considering both the crime and the defendant?**

¶102. Le contends that his death sentence was disproportionate, and that the evidence was insufficient for a jury to find that he intended a killing take place. Le further contends that Mississippi's death penalty statute is unconstitutional as applied to felony capital murder, and that his conviction was in violation of the Eighth and Fourteenth Amendments to the Constitution of the United States.

*Whether the Statute is Unconstitutional*

¶103. Le argues that – even though in *Grayson v. State*, 806 So. 2d 241, 252 (Miss. 2001), this Court held Miss. Code Ann. § 97-3-19(2)(e) constitutionally sound – nevertheless, Mississippi's current jurisprudence equates felony participation with the level of culpability required to impose the death penalty. Thus, Le argues, simply contemplating that lethal force will be used in the commission of a felony does not rise to the same level of culpability as that required by the United States Constitution and Eighth Amendment jurisprudence. Citing *Enmund v. Florida*, 458 U.S. 781, 797, 102 S.Ct. 3368, 3376, 73 L. Ed. 2d 1140 (1982) and *Tison v. Arizona*, 481 U.S. 137 (1987), Le says the Eighth Amendment does not permit the

imposition of the death penalty on a person who only aids and abets the commission of a felony, but who does not himself, kill, attempt to kill, or intend that a killing take place, or intend that lethal force will be employed.

¶104. To address Le's argument, we first turn to the statutes which permit capital punishment. Miss. Code Ann. § 97-3-19(2)(e) (Rev. 2000) provides:

> (2) The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:
> (e) When done with or without any design to effect death, by any person engaged in the commission of the crime of rape, burglary, kidnaping, arson, robbery, . . .

Miss. Code Ann. § 99-19-101(5)(d) (Rev. 2000) provides:

> Aggravating circumstances shall be limited to the following:
>
> (d) The capital offense was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, rape, arson, burglary, kidnaping, . . .

Miss. Code Ann. § 99-19-101(7) (Rev. 2000) provides:

> In order to return and impose a sentence of death the jury must make a written finding of one or more of the following:
>
>> (a) The defendant actually killed;
>> (b) The defendant attempted to kill;
>> © The defendant intended that a killing take place;
>> (d) The defendant contemplated that lethal force would be employed.

¶105. Contrary to Le's argument, this Court has upheld the constitutionality of Miss. Code Ann. § 99-19-101. *Grayson*, 806 So. 2d at 252 (*citing* **Holland v. State**, 705 So. 2d 307, 320 (Miss. 1997)). Le contends, however, that this Court fails to apply the rule announced in *Enmund*, and clarified in *Tison*, as it applies to felony capital murder. In *Enmund*, the United

States Supreme Court held that the Eighth Amendment does not permit the imposition of the death penalty on one "who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." *Enmund*, 458 U.S. at 797.

¶106. In *Tison*, the United States Supreme Court addressed a death penalty decision by the Arizona Supreme Court. The *Tison* Court discussed the *Edmund* intent requirement, stating:

> [T]he Arizona Supreme Court attempted to reformulate "attempt to kill" as a species of foreseeability. The Arizona Supreme Court wrote: "Intend [sic] to kill includes the situation in which the defendant intended, contemplated, or anticipated that lethal force would or might be used or that life would or might be taken in accomplishing the underlying felony." 142 Ariz, at 456, 690 P.2d, at 757.
>
> This definition of intent is broader than that described by the *Enmund* Court. Participants in violent felonies like armed robberies can frequently 'anticipat[e] that lethal force . . . might be used . . . in accomplishing the underlying felony.' Enmund himself may well have so anticipated. Indeed, the possibility of bloodshed is inherent in the commission of any violent felony and this possibility is generally foreseeable and foreseen; it is one principal reason that felons arm themselves. The Arizona Supreme Court's attempted reformation of intent to kill amounts to little more than a restatement of the felony-murder rule itself. Petitioners do not fall within the 'intent to kill' category of felony murderers for which *Enmund* explicitly finds the death penalty permissible under the Eighth Amendment.

*Tison*, 481 U.S. at 150-51. The Supreme Court concluded: "We will not attempt to precisely delineate the particular types of conduct and states of mind warranting imposition of the death penalty here. Rather, we simply hold that major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." *Id.* at 158.

44

¶107. We do not find that *Tison's* restrictive language insulates Le from the death penalty.

This Court has repeatedly held that

> Mississippi's capital sentencing scheme, as a whole, is constitutional. *Woodward v. State*, 726 So. 2d at 528. *See Lockett v. State*, 614 So. 2d 888, 897 (Miss. 1992); *Coleman v. State*, 378 So. 2d 640, 647 (Miss. 1979); *Washington v. State*, 361 So. 2d 61, 65 (Miss. 1978).

> In support of his position that the death penalty is unconstitutional, Stevens cites the United States Supreme Court case *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). The Court in *Tison* held that a defendant must "knowingly engage in criminal activities known to carry a grave risk of death." *Tison v. Arizona*, 481 U.S. at 157-58, 107 S.Ct. at 1687-88. However, *Tison* addressed an Arizona statute which allowed capital punishment for reckless disregard for life. *Id.*

> This is not the situation in the case sub judice. First, reckless disregard for human life is not an aspect of Mississippi's capital sentencing scheme. *See* Miss. Code Ann. § 97-3-19 (2000).

> * * *

> In Mississippi, the capital punishment state Miss. Code Ann. § 99-19-107(a)-(d) provides that in order to return and impose a sentence of death, the jury must make a written finding of one or more of the following factors:

> (a) The defendant actually killed;
> (b) The defendant attempted to kill;
> © The defendant intended that a killing take place;
> (d) The defendant contemplated that lethal force would be employed.

Miss. Code Ann. § 99-19-107(a)-(d)(2000).

> The State must only prove one of the four facts. It is not necessary that the State prove intent where the victim was actually killed. *Lockett v. State*, 517 So. 2d 1317, 1338 (Miss. 1987); *Jordan v. State*, 464 So. 2d 475, 479-80(Miss. 1985); *Williams v. State*, 445 So. 2d 798, 807 (Miss. 1984). Miss. Code Ann. § 99-19-101(7) only requires that one of the factors be found to

45

support a death sentence. ***Smith v. State***, 729 So. 2d 1191, 1218-19 (Miss. 1998); ***Bell v. State***, 725 So. 2d 836, 860-61 (Mis.. 1998).

We find that Steven's argument regarding the unconstitutionality of Mississippi's capital sentencing scheme is wholly without merit.

***Stevens v. State***, 806 So. 2d at 1052-53.

¶108. This Court also held in ***Evans v. State***, 725 So. 2d 613, 684 (Miss. 1997):

Mississippi requires more than simple felony murder to sentence a defendant to death. Miss. Code Ann. § 99-19-101 allows a jury to consider as an aggravating circumstance the fact that a murder was committed while the defendant was engaged in the commission of felony. However, after ***Enmund*** and the amendments to our sentencing scheme, that fact alone is insufficient to impose the death penalty. Rather, a jury must find that the defendant actually killed, attempted to kill, intended that a killing take place, or contemplated that lethal force would be employed in order to impose a death sentence. Our sentencing scheme, consistent with ***Tison***, allows a jury to consider as a mitigating circumstance that the defendant was an accomplice whose participation was relatively minor.

In light of ***Enmund*** and ***Tison***, a critical review of our capital sentencing scheme reveals no constitutional infirmities.

¶109. Le's argument that he was guilty of nothing more than contemplation of lethal force is without merit. Le's jury found more than that one ***Enmund*** factor. In fact, the jury found beyond a reasonable doubt that Le: (1) attempted to kill; (2) intended the killing; and (3) contemplated that lethal force would be employed against Thanh and Minh. In addition, the jury found beyond a reasonable doubt that Le: (1) intended the killing and (2) contemplated that lethal force would be employed against Thuy. Therefore, the jury found more than contemplation that lethal force would be employed with regard to all three murders.

*Limiting Instruction*

46

¶110. Le contends a limiting instruction should have been given, advising the jury that contemplation – without more – was insufficient to find that he intended a killing to take place. Le cites **Randall v. State**, 806 So. 2d 185 (Miss. 2002), in support of this argument. In **Randall**, this Court reversed the trial court because the additional limiting instruction was not given to the jury. **Randall**, 806 So. 2d at 233. However, in **Randall** the jury did not find that Randall killed, attempted to kill or intended that a killing take place. **Id.** at 234. Thus, **Randall** is distinguishable from the facts before us. The State argues that **Randall** is further distinguished from the case sub judice because there was sufficient evidence to support the jury verdict, and because the jury found more than the contemplation of lethal force.

¶111. In **Simmons v. State**, 869 So. 2d 995, 1007 (Miss. 2004), this Court stated:

> The Court has also found the death penalty not to be proportionate for an aider and abetter who is not the actual killer in several other cases. **Smith v. State**, 729 So. 2d 1191 (Miss. 1991); **Ballenger v. State**, 667 So. 2d 1242 (Miss. 1999); **Carr v. State**, 655 So. 2d 824 (Miss. 1995); **Abram v. State**, 606 So. 2d 1015 (Miss. 1992); **Leatherwood v. State**, 435 So. 2d 645 (Miss. 1983).
>
> Simmons also cites **Randall v. State**, 806 So. 2d 185 (Miss. 2001), where this Court found that, where there was no proof as to who actually killed the victim, and the other co-defendant received sentences of less than death, and the jury only found that Randall contemplated that lethal force would be used and nothing else, then the death sentence was disproportionate. While Simmons's case does have similarities to **Randall**, [sic] the case at bar, as this Court noted on direct appeal, the jury found that Simmons intended the killing of Jeffery Wolfe to take place, in addition to finding that Simmons contemplated that lethal force would be employed. This Court specifically found that under these circumstances the death penalty was not disproportionate.

¶112. Le's jury found that he intended the killings to take place. Our standard of review of a jury's findings is as follows:

47

On appeal, 'we review the evidence and reasonable inferences which may be drawn therefrom in the light most consistent with the verdict. We have no authority to disturb the [jury] verdict short of a conclusion on our part that upon the evidence, taken in the light most favorable to the verdict, no rational trier of fact could have found that fact at issue beyond a reasonable doubt." **White v. State**, 532 So. 2d 1207, 1220 (Miss. 1988). This is the guide for testing the legal sufficiency of the evidence to support a finding under §99-19-101(7) . . .

**Smith v. State**, 729 So. 2d 1191, 1218 (Miss. 1998).

¶113. Furthermore, Le admitted, among other things, the following:

- he knew Tran was armed with a gun

- he inflicted injuries on the victims

- he helped hogtie the victims

- he covered the mother's head with a bag and tried to choke her

- he was in the house with the victims for approximately 4 hours

- he and Tran used bleach and water to attempt to clean up the crime scene.

¶114. Furthermore, the State contends the jury could have inferred from the evidence that more than one person would have been necessary to hogtie and kill all three victims, that something would have to be done to the victims because they knew Tran's face very well and that if he tried to kill one of the victims that he intended for all of them to be killed.

¶115. Additionally, we note that Le did not request a limiting instruction at trial and, therefore, is procedurally barred from raising the issue now. We find, however, that even if no procedural bar existed, this issue is without merit.

*Disproportionate Sentencing*

48

¶116. As stated *supra*, the capital murder statutes are constitutional and do not violate the Eighth or Fourteenth Amendments to the United States Constitution. The jury was properly instructed as to the law and returned a verdict of guilty on all three counts of capital murder. Therefore, we cannot say that the sentence of death was disproportionate.

*Miss. Code Ann. § 99-19-105(3)*

¶117. Under Miss. Code Ann. § 99-19-105(3), this Court is required to examine the following factors with regard to a sentence of death:

> (a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;
> (b) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in Section 99-19-101;
> © Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant; and
> (d) Should one or more of the aggravating circumstances be found invalid on appeal, the Mississippi Supreme Court shall determine whether the remaining aggravating circumstances are outweighed by the mitigating circumstances or whether the inclusion of any invalid circumstance was harmless error, or both.

¶118. Le has not presented any evidence that his sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, and there is no evidence in the record that Le's sentence was imposed under such influences. With regard to the finding of the statutory aggravating circumstance, the evidence supports the finding that Le committed the offense while committing a robbery. Finally, as discussed *supra,* and considering the crime and the defendant, the sentence of death is not disproportionate to the penalty imposed in similar cases. (See attached Appendix).

**11. Did the Court err in refusing instructions submitted by the defense?**

49

¶119. Wishing the jury to consider his alleged peaceful character, Le proposed three jury instructions which provided:

D-14

> The Court instructs the Jury that good character may in itself create a reasonable doubt, when otherwise no such doubt would exist. If in the judgment of the jury, the evidence of good character raised a reasonable doubt against any evidence introduced by the prosecution, you have the right to entertain such doubt, and the Defendant should have the benefit of it.

D-15

> The Court instructs the Jury that in case of doubt, Thong Le's previous good reputation for peacefulness should turn the scale in his favor.

D-16

> The Court instructs the Jury that the word "willful" as used in these instructions of law means "intentional." This word is further defined to mean "intending the result which actually comes to pass".

¶120. Our standard of review of alleged error in a trial court's denial of proposed jury instructions is, as follows:

> Jury instructions are to be read together and taken as a whole with no one instruction taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case, however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence. *Humphrey v. State*, 759 So. 2d 368, 380 (Miss. 2000) (citing *Heidel v. State*, 587 So. 2d 835, 842 (Miss. 1991)).

*Austin v. State*, 784 So. 2d 186, 193 (Miss. 2001).

¶121. In refusing proposed jury instruction D-14, the trial court stated:

THE COURT: I'll refuse this. The evidence of good character should go to the jury without any intimation of the Court of its value. That's just like any other factor. That's *Lampkin v. State*, 59 So. 2d 335.

¶122. After refusing proposed D-14, the trial court immediately considered Le's proposed jury instruction D-15. The following exchange took place:

MR. MILLER: Same thing, Judge, incorrect statement of the law; that is, previous good reputation for peacefulness should turn the scale in its favor.

THE COURT: I'll refuse that.

¶123. Le contends that denying the instruction of peacefulness hindered the defense because it prevented the jury from knowing that the defendant's peacefulness was something that could be considered when evaluating his guilt. However, this Court stated in *Lampkin*:

Evidence of good character of the accused should go to the jury as any other fact, and its influence in the determination of a case should be left to the jury, without any intimation of the court of its value. The court should not tell the jury that satisfactory evidence of the good character of the accused is or is not sufficient to raise a reasonable doubt of his guilt. The jury is to have the evidence as an aid to estimate to the other evidence, and by the light of the whole to reach a verdict.

*Lampkin v. State*, 59 So. 2d 335 (Miss. 1952) (citations omitted).

¶124. When the trial court next discussed Le's proposed jury instruction D-16, the State offered the following objection:

THE COURT: All right. D-16?

MR. MILLER: I object. I think it's improper to say that he intends the result which actually comes to pass is not true. If Mr. Nicholson and I decide to come to your house and rob you, and I kill you, but he's there participating in the robbery, we're both guilty of capital murder. He does not have to intend at that point in time that we're going to kill you. That's the whole thing behind a capital murder. It doesn't require any intent whatsoever.

51

THE COURT: It doesn't require - It's with or without design to effect death, I think.

MR. MILLER: That's exactly right. You don't have to have intent. That's the separation of capital murder from regular murder.

MR. CONANT: I would just say then that he may be improperly indicted because the indictment says willfully caused the deaths. And the definition of "willful" comes right out of Blacks Law Dictionary. It's, you know, Black letter law. The indictment does not read that he's charged as having willfully committed these crimes.

THE COURT: Let me look at those instructions again.

MR. MILLER: The law is without the intent.

MR. CONANT: You're correct that the law says with or without. I'm talking about where he started.

THE COURT: Let's just pass that for a minute and I'll look at that a little more.

***

MR. MILLER: On that willful, if he'll look at the indictments, the indictments say, willfully, unlawfully and feloniously without authority of law, and with or without any design to effect the death. And that's exactly why you don't get an instruction like that in a capital murder case.

THE COURT: Let me just take a minute. Let me have the given instructions. Al right. D-16, willfully I think is a correct statement of the law and I'll give it.

MR. MILLER: Judge, I think it's improper. I mean, you're going to confuse the jury. It does not have to be - He does not have to intend the result which actually comes to pass.

THE COURT: Well, S-3(B) says, willfully, unlawfully. and feloniously.

MR. MILLER: I know it does, but you're adding something - a burden to the State that's not there in the law. It's with or without deliberate design. They don't have to have a deliberate design to kill. That's the whole thing. You don't have to intend to kill anybody. If you did, then you're going back to the regular

52

murder statute. The whole thing behind the felony murder, or capital murder is you don't have to intend to kill anybody. I commit a sexual battery and somebody dies, well, I didn't intend to kill her, but if she dies, that's capital murder. You might as well just direct a verdict on the capital murder charge and go for murder if you're going to give this.

THE COURT: I think really I'm going to refuse it. After looking at it, D-16, and looking at the indictment, I think the indictment clearly sets forth the elements, and so I think it would just be something that might be confusing to the jury. I'm going to refuse it.

¶125. Le contends that by denying the willfulness instruction, the trial court prevented the jury from understanding the meaning of the word in the context of capital murder. The State points out that the jury was properly instructed on the degree of intent necessary for a conviction. Jury Instruction 2 (S-3b) provided:

The Defendant, Thong Le, has been charged in the indictment in Count I with the crime of Capital Murder for having killed Minh Hieu Thi Huynh during the commission of the crime of Robbery.

If you find that from the evidence in this case beyond a reasonable doubt:

(1) The incident in this case occurred on or about November 2, 2001, in Jackson County, Mississippi.
(2) Minh Hieu Thi Huynh, was a living human being;
(3) The Defendant did wilfully, unlawfully, and feloniously, with or without deliberate design by his own act or by acting in concert with or aiding and abetting another, did kill, without authority of law, Minh Hieu Thi Huynh; and
(4) That the killing of Minh Hieu Thi Huynh occurred while the Defendant was engaged in the commission of the crime of Robbery;

then you shall find the Defendant, Thong Le guilty of Capital Murder.

If the State has failed to prove any one or more of the above elements beyond a reasonable doubt, then you shall find the defendant not guilty of Capital Murder.

53

¶126. Instruction S-4b and S-5b are the same as S-3b, except S-4b addresses the death of Thuy Hang Hugnh Nguyen, and S-5b addresses the death of Thanh Truc Huynh Nguyen.

¶127. We find these instructions properly informed the jury of the elements of capital murder. They closely track the language of the applicable statutes, they were not confusing, and they defined the crimes for which Le was charged.

¶128. Viewing the jury instructions as a whole, we find the jury was properly instructed as to the elements of capital murder, including the element of intent. We therefore find no merit to this assignment of error.

**12. Was the defendant denied effective assistance of counsel as a result of defense counsel's failure to call any witnesses during the penalty phase of the trial.**

¶129. During the penalty phase of the trial, Le's counsel called no witnesses. In imposing the death penalty, the jury found that "there are insufficient mitigating circumstances to outweigh the aggravating circumstances." As a result, Lee now asserts that he was denied effective assistance of counsel.

¶130. We are instructed by *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), to reverse a conviction where defense counsel's performance was deficient, and the deficiency prejudiced the defense such that there is a reasonable probability that, but for the errors of the defense counsel, the outcome of the trial would have been different.

¶131. Le points out that on August 20, 2002, defense counsel served the prosecutor with a subpoena to appear as a witness in the sentencing phase of the trial regarding a conversation

54

that took place in which the prosecutor informed the defense counsel that the father and husband of the victims returned to Vietnam and did not want to come back to actively pursue the death penalty. However, the prosecutor advised the Court that this information was hearsay, but that it could be brought in through an FBI agent. The defense counsel failed to call the agent to testify in sentencing.

¶132. The record shows that prior to opening statements, the State informed the trial court that the defense had subpoenaed the prosecutor who was trying Le's case. The District Attorney explained to the Court that he had told defense counsel during plea negotiations that the victims' husband and father had left the United States and gone to Vietnam, and that he did not wish to return to pursue the death penalty. The prosecutor stated that this was "hearsay," and that he had never spoken with the victims' husband and father. The prosecutor further stated that another witness had advised the State that an FBI agent had spoken with the victims' family member and that he was neither for or against the death penalty. The prosecutor argued that the defense could question the other witness about the wishes of the victims' family. Defense counsel responded that the other witness had never made these statements to the defense, and that the prosecutor had made the statement about the wishes of the victims' family as a representative of the State, that the District Attorney would be called to testify in that capacity in the sentencing phase. The trial judge held that the defense could elicit testimony about the victims' family's wishes through another witness, and that there was no reason for the District Attorney to be called.

55

¶133. Then, during the opening statement of the sentencing phase, the State made the following statement, in pertinent part:

> Now, you may say, well, why don't we have family members. You notice there are just not any out there, because they're either dead or back in Vietnam. It's not because we wouldn't want to. The situation we have here is we're going to rest on what we've presented to you, ladies and gentlemen. So when I stand up and ask to reintroduce all the evidence, you will understand why.

¶134. Le's counsel was fully aware of the statement made by the father and husband of the victims. He chose not to introduce the statements, presumably for reasons of trial strategy. In any case, regardless of his counsel's reason, we find no prejudice to Le for failure of his counsel to make the jury aware that the father and husband of the victims went back to Vietnam, and did not want to testify.

¶135. Le contends that his trial counsel did not offer even a scintilla of evidence during the penalty phase, and the failure to do so made it appear to the jury that there was nothing good that could be said about the defendant. He contends that both he and his mother were readily available to testify.

¶136. The record demonstrates that the trial judge spoke to Le about his right to testify on his own behalf. The record shows that the trial judge explained to Le that he had the right to testify, but that he was not required to do so, and that it was his choice whether or not to testify. The trial judge explained to Le that if he chose not to testify, the State could not use the fact that he did not testify against him in any way. The trial judge also informed Le that if he did choose to testify, the State would be allowed to cross-examine him. Le stated that he understood all of this, and then stated that his choice was that he would not testify on his own

56

behalf. Le further stated that he had discussed this choice with his attorney, and that he understood his rights.

¶137. The record clearly demonstrates that Le's failure to testify on his own behalf was his choice. The trial court carefully questioned Le to be sure he understood his right to testify, or refrain from taking the stand. In light of Le's decision not to testify, his counsel had no ability to call him as a witness. Thus, on this point, we find no error.

¶138. Le claims that his counsel failed to properly investigate and pursue witnesses or evidence for the penalty phase. However, Le provides us little help in evaluating this claim. This Court has previously stated:

> Where petitioner has given this Court such a sketchy outline of the investigation performed by counsel without any way of knowing counsels' impressions or the reasons behind counsels' decisions, we are left with the presumption that counsel had this evidence, reviewed this evidence, and considered it, as a matter of strategy, that it was in his client's best interest not to bring it out. Notwithstanding, we do not find that the evidence mentioned, even if it all had been presented at sentencing was of a nature, in its entirety, to cast any doubt as to the propriety of the jury's verdict and, as a result, this claim fails. *See Woodward*, 843 So. 2d at 7.

*Crawford v. State*, 867 So. 2d 196, 218 (Miss. 2003), citing *Holly v. State*, 716 So.2d 979, 990-91 (Miss. 1998).

¶139. This Court has also held:

> The standard for determining if a defendant received effective assistance of counsel is well settled. "The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A defendant must demonstrate that his counsel's performance was deficient and that the deficiency prejudiced

57

the defense of the case. *Id.* at 687, 104 S.Ct. 2052. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Stringer v. State*, 454 So. 2d 468, 477 (Miss. 1984) (citing *Strickland v. Washington*, 466 U.S. at 687, 104 S.Ct. 2052). The focus of the inquiry must be whether counsel's assistance was reasonable considering all the circumstances. *Id.*

*Burns v. State*, 813 So. 2d 668, 673 (Miss. 2001).

¶140. Le sums up his claim by stating that, for failing to present mitigation evidence at the sentencing phase, including the statement made by the father and husband, the testimony of his mother and his own testimony, his counsel was ineffective. Le specifically states:

> Clearly, the jury should have heard this testimony. A strategic choice cannot be supported by a complete failure to call any witnesses particularly those who stand readily available in the courthouse to mitigate against the death penalty. The failure surely made it appear to the jury that there was in fact nothing good that could be said about the defendant even by his mother.

Le generally relies on *Jones v. Thigpen*, 788 F.2d 1101, 1103 (5th Cir. 1986) which held:

> Defense counsel either neglected or ignored critical matters of mitigation at the point when the jury was to decide whether to sentence Jones to death. We agree with the district judge that this failure was professionally unreasonable, and that it was prejudicial to the defendant in that there is a reasonable probability that had this evidence been presented, the jury would have concluded that death was not warranted.

¶141. We find Le's case to be wholly distinguishable from *Jones*, which involved failure to present the mitigating factors of age and mental disabilities, which the Fifth Circuit characterized as follows:

> He presented no proof to the jury of these mitigating factors of age and mental disability. He presented no mitigating circumstances at all. When the prosecution rested, he rested.

> At the habeas hearing in the federal district court, a clinical psychologist who had examined Jones testified that his full I.Q. was less than 41, that he was emotionally disturbed, that he was severely limited in his capacity to think and did not understand what was happening around him. The psychologist and psychiatrist testifying for the State agreed that he was mentally retarded, although they thought his capacity exceeded the measure of his test results.

*Id.*

¶142. We acknowledge the United States Supreme Court's decision in *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), in which defense counsel's decision not to expand investigation of the defendant's life history beyond the presentence investigation report and department of social services records was held to constitute ineffective assistance of counsel. In *Wiggins*, the petitioner presented powerful mitigating evidence that defense counsel had failed to discover and present at his trial. *Id.* at 512, 2531.[7] In light of the nature and extent of this evidence, the Supreme Court held there was a reasonable probability that a competent attorney would have presented this evidence and that a jury would have returned with a different sentence. *Id.* at 513. However, *Wiggins* is distinguishable from the case sub judice. Here, Le has not shown what mitigating evidence his attorney failed to present at his sentencing. Le merely states that his trial counsel should have called himself and his mother to testify. Additionally, Le argues that his counsel was ineffective in failing to call an FBI

---

[7]Wiggins showed that defense counsel had failed to discover and present that he had "experienced severe privation and abuse while in the custody of his alcoholic, absentee mother and physical torment, sexual molestation, and repeated rape while in foster care." Additionally, Wiggins had been homeless and was of diminished mental capacity. The *Wiggins* Court held that this was the kind of personal history that is relevant to assessing a defendant's moral culpability. 539 U.S. at 513 (citing *Penry v. Lynaugh*, 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256).

agent that would have testified about the victims' family's decision not to pursue the death penalty against Le.

¶143. Le has not shown that his trial counsel was ineffective. Le's attorney demonstrated that his failure to call Le and his mother was a strategic decision. Had defense counsel called Le or Le's mother to testify, he would have opened the door for harmful testimony about Le's alleged gang and drug activity. As for the failure to call the FBI agent, Le has not provided any specific information with regard to the FBI agent or what his or her testimony would have been. Without some demonstration that this testimony would have been admissible, we cannot say that there is a reasonable probability that the outcome of Le's trial would have been different.

¶144. Le failed to demonstrate ineffective assistance of counsel under the *Strickland* analysis; that is, he has failed to demonstrate that, had his counsel called the witnesses, there is a reasonable probability that the jury the outcome would have been different. Therefore, this issue is without merit.

### 13. Was the defendant denied effective assistance of counsel as a result of defense counsel's failure to use peremptory challenges?

¶145. Le's counsel used eleven of his twelve peremptory challenges. Le says the twelfth strike should have been used to remove juror number 23, who was the victim of three robberies, or juror number 39, who was the brother-in-law of the Assistant Police Chief in Ocean Springs, or jurors 11 or 23, who both claim they heard something about the case in news media.[8]

---

[8]Le also points out that juror number 11's caller I.D showed a call from "T. Le."

60

¶146. Le cites *Triplett v. State*, 666 So. 2d 1356 (Miss. 1995), in which this Court reversed, citing numerous acts of ineffective assistance of counsel, including the failure to pursue challenges. Le then generally alleges that he was prejudiced, and that there is a reasonable probability that the conduct affected the outcome of the trial.

¶147. In *Triplett*, the defense counsel failed "to perform any act basic to the defense of the accused." *Id.* at 1361. In fact, it was found that the trial counsel's "failure to challenge a single prospective juror . . . strongly suggest[ed] no preparation in the selection of the jury." *Id.* at 1361-62.

¶148. Le's counsel conducted an extensive voir dire. He challenged certain jurors for cause, and successfully defended some of the State's challenges for cause. Additionally, Le's counsel raised and argued a *Batson* challenge, and exercised eleven peremptory challenges on the regular jury panel and all peremptory challenges available for the alternate jurors. He moved to quash the venire and repeatedly moved for additional peremptory challenges and individual, sequestered voir dire. We find this defense to be in stark contrast to the defense in *Triplett*.

¶149. Each of the jurors Le claims should have been struck stated in voir dire that they could be fair and impartial. Juror number 23, June Seymour, was questioned about the fact that she had heard about the murders on the news, and the fact that she lived near the scene of the crime. Seymour testified that she could be fair and impartial and that this would not have any bearing or effect on her decision in the case. Seymour was also questioned about the fact that she had

been the victim of several robberies that involved violence. Seymour again testified that this would not have an effect on her decision-making ability as a juror because such events were "a fact of life." Juror 39, George Short, testified that his brother-in-law was an assistant police chief. When questioned, Short stated that this would have no bearing on his decision in this case if called as a juror. Juror Number 11, Tanya Cossey, testified that several days after she filled out her paperwork related to jury duty in the instant case, she saw a call from a residence in D'Iberville under the name "T. Le." Cossey stated that she did not speak to the caller, but simply saw the name on her caller I.D., and contacted the D.A.'s office. Cossey further stated that no one in the D.A.'s office had discussed the case with her in any way. Cossey testified that she thought that this was a coincidence, and that it would not have any affect on her decision-making ability as a juror. Cossey also stated that she had heard about the murders a day or two after they occurred, but nothing she had heard would influence her decision in the case if called as juror.

¶150. In *Wilcher v. State*, 863 So. 2d 719 (Miss. 2003), this Court was faced with the same issue. Wilcher raised ineffective assistance of counsel because his attorney did not use all of his peremptory challenges

> despite three of the selected jurors being related to someone who was either in law enforcement or an Assistant U.S. Attorney and an alternate juror selected was a former federal prosecutor who had previously prosecuted a capital murder case in California.

*Id.* at 755. This Court held:

> The Fifth Circuit Court of Appeals considers an attorney's actions during voir dire to be a matter of trial strategy, which "cannot be the basis for a claim of

62

ineffective assistance of counsel unless counsel's tactics are shown to be 'so ill chosen that it permeates that entire trial with obvious unfairness.'" ***Teague v. Scott***, 60 F.3d 1167, 1172 (5th Cir. 1995) (quoting ***Garland v. Maggio***, 717 F.2d 199, 206 (5th Cir. 1983)). Federal courts have held that an attorney's failure to exercise peremptory challenges does not give rise to a claim of ineffective assistance of counsel absent a showing that the defendant was prejudiced by the counsel's failure to exercise the challenges. ***United States v. Taylor***, 832 F.2d 1187 (10th Cir. 1987). *See also* ***Mattheson v. King***, 751 F.2d 1432, 1438 (5th Cir. 1985).

*Id.* (citing ***Burns v. State***, 813 So. 2d 668, 675-76 (Miss. 2001).

¶151. This Court concluded: "Wilcher has not 'overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"" *Id.* at 755 (quoting ***Stringer***, 454 So. 2d at 277 (quoting ***Strickland***, 466 U.S. at 689, 104 S.Ct. 2052)).

¶152. As in ***Wilcher***, each juror raised by Le was questioned during voir dire, and each concluded that they could be fair and impartial if selected to sit on the jury. Le fails to demonstrate any prejudice as a result of his counsel's failure to strike one of the enumerated jurors. Instead, he generally alleges that these deficiencies were prejudicial, and that there is a reasonable probability that the conduct affected the outcome of the trial. We find no merit to Le's argument.

**14. Did the court err in admitting gruesome photographs into evidence?**

¶153. The trial court allowed the State to place into evidence numerous photographs of the victims. However, the only objection offered to the photographs was repetition.

63

¶154. The prosecution stated that the photos of the victims were being offered to show the position of the bodies in reference to the room and show how the hands and feet were bound. Further, according to the State, the photographs corroborated Graham's drawing.

¶155. Le now argues that the photographs were not relevant because neither the identity of the victims nor the manner of death was contested. Le contends there was no need for the photographs to explain to the jury how the victims were tied and injured, since all of those facts were established through witnesses without the necessity of the photographs.

¶156. Miss. R. Evid. 403 provides that photographs should be excluded where their probative value is outweighed by their prejudicial impact. Furthermore, "photographs which are gruesome or inflammatory and lack an evidentiary purpose are always inadmissible as evidence." *McFee v. State*, 511 So. 2d 130, 134 (Miss. 1987). Le cites this rule, and points out that "[t]he trial court must consider: (1) Whether the proof is absolute or in doubt as to identity of the guilty party, as well as, (2) whether the photographs are necessary evidence or simply a ploy on the part of the prosecutor to arouse the passion and prejudice of the jury." *McNeal v. State*, 551 So. 2d 151 (Miss. 1989). Le further reminds us that this Court has held:

> photographs of the victim should not ordinarily be admitted into evidence where the killing is not contradicted or denied, and the corpus deliciti and the identity of the deceased have been established.

*Sudduth v. State*, 562 So. 2d 67, 70 (Miss. 1990). Finally, Le says the probative value of the photographs was drastically reduced because he was willing to stipulate to the cause of death, but we do not find in the record where he offered to do so.

64

¶157. In *McNeal*, the photographs were of a badly deteriorated body and included a "full-color, close-up view of the [victim's] decomposed, maggot-infested skull." *McNeal*, 551 So. 2d at 159. Holding that the trial court judge abused his discretion in admitting the photographs, this Court commented that the photographs were among "some of the most gruesome photographs ever presented to this Court." *Id.*

¶158. Regarding the admissibility of photographs, this Court has held:

> In *Westbrook v. State*, 658 So.2d 847, 849 (Miss.1995), this Court found that photographs of a victim have evidentiary value when they aid in describing the circumstances of the killing, *Williams v. State*, 354 So.2d 266 (Miss.1978); describe the location of the body and cause of death, *Ashley v. State*, 423 So.2d 1311 (Miss.1982); or supplement or clarify witness testimony, *Hughes v. State*, 401 So.2d 1100 (Miss.1981).
>
> The admissibility of photographs rests within the sound discretion of the trial court. *Jackson v. State*, 672 So.2d 468, 485 (Miss.1996); *Griffin v. State*, 557 So. 2d 542, 549 (Miss.1990); *Mackbee v. State*, 575 So.2d 16, 31 (Miss.1990); *Boyd v. State*, 523 So.2d 1037, 1039 (Miss.1988). Moreover, the decision of the trial judge will be upheld unless there has been an abuse of discretion. *Westbrook,* 658 So.2d at 849.
>
> *Gray v. State*, 728 So.2d 36, 57 (Miss.1998).
>
> This standard is very difficult to meet . In fact, the " ' discretion of the trial judge runs toward almost unlimited admissibility regardless of the gruesomeness, repetitiveness, and the extenuation of probative value.' " **Brown**, 690 So.2d at 289; *Holly,* 671 So.2d at 41. "At this point in the development of our case law, no meaningful limits exist in the so-called balance of probative/prejudicial effect of photographs test." *Chase,* 645 So.2d at 849 (quoting *Williams v. State*, 544 So.2d 782, 785 (Miss.1987) ).
>
> *Woodward v. State*, 726 So. 2d 524, 535 (Miss. 1997).

*Stevenson v. State*, 733 So. 2d 177, 180 (Miss. 1998).

¶159. The photographs were used to corroborate the testimony of Graham and Dr. McGarry, who conducted the autopsy. Graham used the photographs to demonstrate what he found at the crime scene and to explain his diagram of the crime scene, and McGarry used the photographs to explain and describe the victims' injuries. As such, Le was not unfairly prejudiced by the admission of the photographs and, therefore, the trial court did not abuse its discretion in admitting them into evidence. Therefore, this issue is without merit.

### 15. Was the verdict against the overwhelming weight of the evidence?

¶160. Le contends that the trial court erred when it denied the motion for a directed verdict after the close of the State's case because the verdict is contrary to established law and against the overwhelming weight of the evidence.

¶161. Le contends that there is no physical evidence which refutes his contention that Tran committed the murders wholly on his own. Le further states that the only testimony implicating him in the murders came from Tran and his own coerced confession. Le cites *Wheeler v. State*, 560 So. 2d 171 (Miss. 1991), in support of his contention that an alleged accomplice's statement should always be viewed with great care and caution.

¶162. Le further contends that the State did not produce sufficient evidence at trial to establish beyond a reasonable doubt the he possessed the requisite intent to commit murder. In *Smith v. State*, 802 So. 2d 82 (Miss. 2001) this Court held:

> We proceed by considering all of the evidence--not just that supporting the case for the prosecution--in the light most consistent with the verdict. We give the prosecution the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered point in favor of the

66

accused with sufficient force that reasonable men could not have found beyond a reasonable doubt that he was guilty, reversal and discharge are required.

*Id.* at 85.

¶163. The denial of a motion for directed verdict and JNOV is a ruling on the sufficiency of the evidence. The standard of review is:

> [W]e must, with respect to each element of the offense, consider all of the evidence–not just the evidence which supports the case for the prosecution–in the light most favorable to the verdict. The credible evidence which is consistent with the guilt must be accepted as true. The prosecution must be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. Matters regarding the weight and credibility to be accorded the evidence are to be resolved by the jury. We may reverse only where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty.

*Wetz v. State*, 503 So. 2d 803, 807 (Miss. 1987)(citations omitted).

¶164. The standard of review regarding the weight of the evidence is:

> A motion for a new trial is addressed to the sound discretion of the trial judge who may grant a new trial if he deems such is required in the interest of justice or is the verdict is contrary to law or the weight of the evidence. The trial judge should not order a new trial unless he is convinced that the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would be to sanction an unconscionable injustice.
>
> In reviewing this claim, this Court must accept as true the evidence favorable to the State. This Court will reverse only when it is convinced that the trial judge has abused his discretion. Further, where there is conflicting testimony, the jury is the judge of the credibility of the witnesses.

*Wetz*, 503 So. 2d at 812 (citations omitted).

¶165. Le cites Miss. Code Ann § 97-3-19 (2)(e) (Rev. 2000) which defines capital murder as: "The killing of a human being without the authority of law by any means or in any manner

shall be capital murder . . . [w]hen done with or without any design to effect death, by any person engaged in the commission of the crime of rape, burglary, kidnapping, arson, robbery, ...” Le says he did not have the intent to kill. However, as discussed *supra*, Le participated in the murders while committing a robbery. Intent to commit murder is not an element of capital murder. Furthermore, the jury specifically found beyond a reasonable doubt that Le: (1) attempted to kill; (2) intended the killing; and (3) contemplated that lethal force would be employed with regard to Thanh Truc Huynh Nguyen and Minh Hieu Thi Huynh. In addition, the jury found beyond a reasonable doubt that Le: (1) intended the killing and (2) contemplated that lethal force would be employed with regard to Thuy Hang Hugnh Nguyen. Thus, when accepting the credible evidence of Le’s guilt as true, and giving the State the benefit of all favorable inferences, we find there is sufficient evidence to support Le’s conviction and the verdict was not against the overwhelming weight of the evidence. Therefore, this issue is without merit.

## CONCLUSION

¶166. For the reasons stated herein, we affirm Le’s conviction and sentence of death.

¶167. **CONVICTION OF CAPITAL MURDER (THREE COUNTS) AND SENTENCE OF DEATH BY LETHAL INJECTION, AFFIRMED.**

**WALLER AND COBB, P.JJ., EASLEY, CARLSON AND RANDOLPH, JJ., CONCUR. SMITH, C.J., DIAZ AND GRAVES, JJ., NOT PARTICIPATING.**

## APPENDIX

## DEATH CASES AFFIRMED BY THIS COURT

*Brown v. State,* --- So. 2d --- (Miss. 2004).

*Powers v. State* 883 So.2d 20 (Miss. 2004)

*Branch v. State,* 882 So.2d 36 (Miss. 2004).

*Scott v. State,* 878 So.2d 933 (Miss. 2004).

*Lynch v. State,* 877 So.2d 1254 (Miss. 2004).

*Dycus v. State,* 875 So.2d 140 (Miss. 2004).

*Byrom v. State,* 863 So.2d 836 (Miss. 2003).

*Howell v. State,* 860 So.2d 704 (Miss. 2003).

*Howard v. State,* 853 So.2d 781 (Miss. 2003).

*Walker v. State,* 815 So.2d 1209 (Miss. 2002). *following remand.

*Bishop v. State,* 812 So.2d 934 (Miss. 2002).

*Stevens v. State,* 806 So.2d 1031 (Miss. 2002).

*Grayson v. State,* 806 So.2d 241 (Miss. 2002).

*Knox v. State,* 805 So.2d 527 (Miss. 2002).

*Simmons v. State,* 805 So.2d 452 (Miss. 2002).

*Berry v. State,* 802 So.2d 1033 (Miss. 2001).

*Snow v. State*, 800 So.2d 472 (Miss. 2001).

*Mitchell v. State,* 792 So.2d 192 (Miss. 2001).

*Puckett v. State,* 788 So.2d 752 (Miss. 2001). * following remand.

*Goodin v. State,* 787 So.2d 639 (Miss. 2001).

*Jordan v. State,* 786 So.2d 987 (Miss. 2001).

*Manning v. State,* 765 So.2d 516 (Miss. 2000). *following remand.

*Eskridge v. State,* 765 So.2d 508 (Miss. 2000).

*McGilberry v. State,* 741 So. 2d 894 (Miss. 1999)**.**


### DEATH CASES AFFIRMED BY THIS COURT

**(continued)**

*Puckett v. State,* 737 So. 2d 322 (Miss. 1999).          *remanded for *Batson* hearing.

*Manning v. State,* 735 So. 2d 323 (Miss. 1999). *remanded for *Batson* hearing.

*Hughes v. State,* 735 So. 2d 238 (Miss. 1999).

*Turner v. State,* 732 So. 2d 937 (Miss. 1999).

*Smith v. State,* 729 So. 2d 1191 (Miss. 1998).

*Burns v. State,* 729 So. 2d 203 (Miss. 1998).

*Jordan v. State,* 728 So. 2d 1088 (Miss. 1998).

*Gray v. State,* 728 So. 2d 36 (Miss. 1998).

*Manning v. State,* 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State,* 726 So. 2d 524 (Miss. 1997).

*Bell v. State,* 725 So. 2d 836 (Miss. 1998).

*Evans v. State,* 725 So. 2d 613 (Miss. 1997).

*Brewer v. State,* 725 So. 2d 106 (Miss. 1998).

*Crawford v. State,* 716 So. 2d 1028 (Miss. 1998).

*Doss v. State,* 709 So. 2d 369 (Miss. 1996).

*Underwood v. State,* 708 So. 2d 18 (Miss. 1998).

*Holland v. State,* 705 So. 2d 307 (Miss. 1997).

*Wells v. State,* 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581(Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

***Shell v. State***, 554 So. 2d 887 (Miss. 1989), ***Shell v. Mississippi***, 498 U.S. 1 (1990) reversing, in part, and remanding, ***Shell v. State***, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d  165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

***Pinkney v. State***, 538 So. 2d 329 (Miss. 1989), ***Pinkney v. Mississippi***, 494 U.S. 1075 (1990) vacating and remanding ***Pinkney v. State***, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

***Clemons v. State***, 535 So. 2d 1354 (Miss. 1988), ***Clemons v. Mississippi***, 494 U.S. 738 (1990) vacating and remanding, ***Clemons v. State***, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.


## DEATH CASES AFFIRMED BY THIS COURT
### (continued)


*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).
***Jones v. State***, 517 So. 2d 1295 (Miss. 1987)*, **Jones v. Mississippi***, 487 U.S. 1230 (1988) vacating and remanding, ***Jones v. State***, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So. 2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

\* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

**DEATH CASES REVERSED AS TO GUILT PHASE
AND SENTENCE PHASE**

*Flowers v. State,* 842 So.2d 531 (Miss. 2003).

*Randall v. State,* 806 So. 2d 185 (Miss. 2002).

*Flowers v. State,* 773 So.2d 309 (Miss. 2000).

*Edwards v. State,* 737 So. 2d 275 (Miss. 1999).

*Smith v. State,* 733 So. 2d 793 (Miss. 1999).

*Porter v. State,* 732 So.2d 899 (Miss. 1999).

*Kolberg v. State,* 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State,* 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State,* 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State,* 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

## DEATH CASES REVERSED AS TO GUILT PHASE
## AND SENTENCE PHASE
### (continued)

*Houston v. State*, 531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

## DEATH CASES REVERSED
## AS TO PUNISHMENT AND REMANDED
## FOR RESENTENCING TO LIFE IMPRISONMENT

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

# DEATH CASES REVERSED AS TO
# PUNISHMENT AND REMANDED FOR A NEW TRIAL
# <u>ON SENTENCING PHASE ONLY</u>

*King v. State,* 784 So.2d 884 (Miss. 2001).

*Walker v. State,* 740 So.2d 873 (Miss. 1999).

*Watts v. State,* 733 So.2d 214 (Miss. 1999).

*West v. State,* 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State,* 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State* 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) vacating and remanding, *Pinkney v. State,* 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*\*Jones v. State*, 517 So. 2d 1295 (Miss. 1987), *Jones v. Mississippi,* 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

**DEATH CASES REVERSED AS TO**
**PUNISHMENT AND REMANDED FOR A NEW TRIAL**
**ON SENTENCING PHASE ONLY**
**(continued)**

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (1996).

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied Wiley v. Mississippi*, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State,* 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, *Wiley v. State*, 95-DP-00149, February 13, 1997 (rehearing pending).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984). * Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.